STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Lawrence A. WILLIAMS, Defendant-Respondent.

STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Antwon C. MATHEWS, Defendant-Respondent.

Supreme Court

*Nos. 01–0463–CR, 01–0464–CR. Oral argument March 7, 2002.—Decided July 9, 2002.*

2002 WI 94

(Also reported in 646 N.W.2d 834.)

1

3

For the plaintiff-appellant-petitioner the cause was argued by *Stephen W. Kleinmaier,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

For the defendant-respondent, Lawrence A. Williams, there was a brief by *Thomas E. Knothe* and *Collins, Quillin & Knothe, Ltd.,* La Crosse, and oral argument by *Thomas E. Knothe.*

For the defendant-respondent, Antwon C. Mathews, there was a brief by *Peter J. Thompson,* Eau Claire, and oral argument by *Peter J. Thompson.*

¶ 1. DIANE S. SYKES, J. This case involves a consent search of a vehicle, and the issue is whether the driver was "seized" for purposes of the Fourth Amendment when he consented to the search.

¶ 2. Defendant Lawrence Williams was stopped for speeding on I-94. The state trooper conducting the stop issued a warning citation and returned Williams' driver's license and other paperwork, said "[we]'ll let you get on your way then," shook hands, and headed back to his squad car. After two steps, the trooper abruptly turned around and began questioning Williams about whether he had any guns, knives, drugs, or large amounts of money in the car, and asked for permission to search. Williams denied having any of the items in question, and gave consent to search. The trooper found heroin and a gun.

¶ 3. Williams and his passenger, Antwon Mathews, were charged with possession of heroin with intent to deliver and carrying a concealed weapon. The circuit court suppressed the physical evidence recovered in the search, concluding that Williams' consent

4

was invalid because his continued detention after the traffic stop had concluded was illegal. The state appealed, and the court of appeals affirmed. We accepted review, and now reverse.

¶ 4. The question of whether a police contact is a "seizure" under the Fourth Amendment is determined by reference to an objective test. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554 (1980). Here, the traffic stop that immediately preceded Williams' consent was over, and he had been told unequivocally that he was free to leave. The trooper's subsequent questioning did not constitute a new seizure. Accordingly, Williams' consent to the vehicle search was not invalid as a result of an illegal seizure. The drugs and the gun should not have been suppressed.

I

¶ 5. The facts are from the complaint, the suppression hearing, the state trooper's incident report, and a videotape of the traffic stop, the latter two items having been admitted into evidence at the suppression hearing.[1] At approximately 2:30 a.m. on June 7, 2000, State Trooper James Fetherston was patrolling I-94 in Eau Claire County when he observed a vehicle approaching him rapidly. Fetherston allowed the vehicle to pass, clocked it at 78.7 m.p.h., activated his emergency flashing lights, and pulled the car over for speeding.

---

[1] The court has viewed the videotape.

5

¶ 6. Lawrence Williams was the driver and Antwon Mathews was his front-seat passenger. Fetherston approached the driver's side window, explained that he had stopped the car for speeding, and asked Williams for his driver's license. He then asked Williams whose car he was driving. Williams replied that it was a rental car and that he did not know who the renter was. Mathews told the officer that the car had been rented by his uncle. Williams produced the rental papers and gave them to Fetherston. During this exchange, Williams appeared very nervous, was breathing very fast, and would not make eye contact with the trooper.

¶ 7. Fetherston told Williams and Mathews to "sit tight for a minute," and returned to his patrol car to call in Williams' license. He also requested back-up, saying he had "a Badger going." This particular state patrol terminology, no longer in use, refers to a law enforcement interdiction technique by which the officer attempts to obtain the driver's consent to search the vehicle.

¶ 8. The dispatcher reported that Williams' license was valid and the vehicle was not stolen, but alerted Fetherston that Williams had come up a "ten-zero" on prior offenses, which Fetherston testified meant "caution." At some point during this process, Fetherston turned off his squad's emergency lights. Eau Claire County Sheriff's Deputy Jonathan Staber arrived as backup, parking his squad behind Fetherston's and leaving his emergency lights activated. Both officers then walked towards Williams' car, Staber on the passenger side, and Fetherston on the driver's side.

¶ 9. Fetherston asked Williams to step out of the car. While standing with Williams at the rear of the car, Fetherston pointed out that the rental agreement did not allow Williams to be driving. Williams said he was

6

unaware of that fact. Fetherston then returned Williams' driver's license and the rental papers, and indicated he was going to issue a warning for speeding. He showed Williams the warning citation and said, "This is a warning for speeding, need a signature and we'll get you on your way then." The tone throughout, on both sides, was polite and conversational.

¶ 10. During this exchange, Staber, the back-up officer, was standing next to the passenger side of Williams' car. He held a flashlight in his right hand illuminating the inside of the vehicle, and generally kept his left hand resting on the front of his belt.

¶ 11. Williams signed the warning citation. Fetherston handed it to him and asked if he had any questions. Williams stated that he did not, that he was familiar with the state patrol, and knew how everything worked. The officer replied, "Good, we'll let you get on your way then okay."

¶ 12. Williams extended his hand to the officer and said, "Okay. You have a good day." They shook hands, and Fetherston said, "Take care. We'll see you." Williams turned around and took a couple of steps towards his car. Fetherston turned toward his squad, took a step or two, then abruptly swiveled back around and in a louder but still conversational tone said, "Hey Lawrence." Williams turned back to face Fetherston, replying, "Yes, sir?" Then, in a rapid succession of questions, Fetherston asked Williams about any contraband he and/or Mathews might be carrying:

Fetherston (Q): There's no guns in the car is there?

Williams (A): No, sir.

Q: Any knives?

A: No, sir.

7

Q: How about any drugs? You guys got any drugs in there?

A: No, sir.

Q: Any large amounts of money? You guys bringing, not bringing, back any big quantities of money . . .

A: No.

Q: . . . from . . .

A: No.

Q: May I search your car just to be sure those items that I mentioned are not in there?

A: Yes, sir.

Q: That's fine?

A: Yes, sir.

¶ 13. Mathews, an amputee, was then asked to step out of the car. The officer assisted Mathews with his crutches, and Mathews engaged him in a friendly, detailed conversation about a prosthesis he was hoping to get and a lawsuit he was pursuing over how he lost his leg. Fetherston then searched the car and found a loaded handgun and heroin. Williams and Mathews were arrested and charged with possession of heroin with intent to deliver and carrying a concealed weapon, as party to the crime, contrary to Wis. Stat. §§ 961.41(1m)(d)3, 941.23, and 939.05 (1999–2000).[2]

---

[2] All future references to the Wisconsin Statutes will be to the 1999–2000 version unless otherwise stated.

¶ 14. Williams moved to suppress the evidence obtained in the search of his vehicle.[3] The Eau Claire County Circuit Court, the Honorable Benjamin D. Proctor, granted the motion.

¶ 15. The circuit court concluded that Fetherston needed new, separate, and sufficient "reasonable suspicion" to support any further investigation beyond the original traffic stop, and here, all the officer had was "mere curiosity," such that his request for permission to search was just "a shot in the dark." The court held that "[i]t is unreasonable to suspect that under those circumstances any citizen would think that he or she had a right to be uncooperative in the presence of two law enforcement officers at 2:30 in the morning and that any reasonable citizen under those circumstances would think that uncooperativeness might be just cause for further detention. It cannot be expected that every citizen be a lawyer."

¶ 16. The State appealed,[4] and the court of appeals affirmed. *State v. Williams*, 2001 WI App 249, 248 Wis. 2d 361, 635 N.W.2d 869. Applying the *Mendenhall* test, the court concluded that Williams was "seized" within the meaning of the Fourth Amendment at the time he consented to the search. The court emphasized that its conclusion was based on the totality of the circumstances—including, in particular, the rapid succession of questions, the more abrupt and slightly

---

[3] Although Mathews did not file a separate motion, his counsel participated in the suppression hearing and the circuit court's order pertained to both Williams' case and Mathews' case. Prior to the State's appeal, the parties entered into a stipulation preserving Mathews' rights for purposes of this appeal.

[4] The court of appeals granted the State's motion to consolidate Williams' and Mathews' appeals.

louder tone, the presence and stance of the back-up officer, the flashing emergency lights of the second squad, the location (a rural interstate highway), and the time of night (2:30 a.m.). *Williams,* 2001 WI App 249, ¶ 19. In this situation, the court held, a reasonable person "would not have felt free to disregard the questions and walk away." *Id.*

## II

¶ 17. This case presents a question of constitutional fact subject to a two-part standard of review. *State v. Matejka,* 2001 WI 5, ¶ 16, 241 Wis. 2d 52, 621 N.W.2d 891; *see also State v. Griffith,* 2000 WI 72, ¶ 23, 236 Wis. 2d 48, 58, 613 N.W.2d 72. The circuit court's findings of evidentiary or historical fact are upheld unless clearly erroneous. *Matejka,* 2001 WI 5, ¶ 16. The determination of whether Williams was "seized" for Fourth Amendment purposes is reviewed de novo. *Id.*

¶ 18. Warrantless searches are per se unreasonable under the Fourth Amendment.[5] *Katz v. United States,* 389 U.S. 347, 357 (1967). But there are certain "specifically established and well-delineated" exceptions

---

[5] The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. Amend. IV. Article I, Section 11 of the Wisconsin Constitution is nearly identical, and states in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures . . . " This court has generally followed the United States Supreme Court's Fourth Amendment jurisprudence when interpreting the Wisconsin Constitution's parallel provision. *State v. Matejka,* 2001 WI 5, ¶ 17 n.2, 241 Wis. 2d 52, 621 N.W.2d 891.

to the Fourth Amendment's warrant requirement. *Id.* Included among these exceptions are searches conducted pursuant to voluntarily given consent. *Id.* at 358; *State v. Phillips,* 218 Wis. 2d 180, 196, 577 N.W.2d 794 (1998).

¶ 19. A "search authorized by consent is wholly valid" under the Fourth Amendment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222 (1973). Consent searches are standard, accepted investigative devices used in law enforcement, and are not in any general sense constitutionally suspect. *Id.* at 231–32, 243.

¶ 20. The defendants contend, and the lower courts held, that the consent to search in this case was invalid because Williams was illegally "seized" when he gave it. Not all encounters with law enforcement officers are "seizures" within the meaning of the Fourth Amendment. *Florida v. Bostick,* 501 U.S. 429, 434 (1991); *State v. Kelsey C.R.,* 2001 WI 54, ¶ 30, 243 Wis. 2d 422, 442, 626 N.W.2d 777. The general rule is that a seizure has occurred when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." *Mendenhall,* 446 U.S. at 552 (quoting *Terry v. Ohio,* 392 U.S. 1, 19, n.16 (1968)); *State v. Harris,* 206 Wis. 2d 243, 253, 557 N.W.2d 245 (1996).

¶ 21. The *Mendenhall* test for determining whether a particular police contact constitutes a seizure for purposes of the Fourth Amendment was adopted by the United States Supreme Court in *INS v. Delgado,* 466 U.S. 210, 215 (1984), and *Michigan v. Chesternut,* 486 U.S. 567, 573 (1988), and derives from Justice Stewart's lead opinion in the *Mendenhall* case:

We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. . . . In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Mendenhall,* 446 U.S. at 554–55 (citations omitted); *see also California v. Hodari D.,* 499 U.S. 621, 627–28 (1991).

¶ 22. Questioning by law enforcement officers does not alone effectuate a seizure. "[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation." *Delgado,* 466 U.S. at 216. Unless the surrounding conditions "are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment."[6] *Delgado,* 466 U.S. at

---

[6] If a person is not free to leave due to circumstances unrelated to the presence of an officer, then the proper inquiry is whether the totality of the circumstances establishes that a reasonable person "would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick,* 501 U.S. 429, 436 (1991) (applying the above inquiry where the individual did not feel free to leave because the bus in which he was sitting was about to depart).

216; *see also Griffith,* 2000 WI 72, ¶ 39. "As long as the person to whom the questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particular and objective justification." *Mendenhall,* 446 U.S. at 554.

¶ 23. The *Mendenhall* test for determining whether a seizure has occurred "is necessarily imprecise because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Chesternut,* 486 U.S. at 573. The test is an objective one, focusing not on whether the defendant himself felt free to leave but whether a reasonable person, under all the circumstances, would have felt free to leave. *Hodari D.,* 499 U.S. at 628; *Chesternut,* 486 U.S. at 574. "[T]he 'reasonable person' test presupposes an innocent person." *Bostick,* 501 U.S. at 438. While it is true that "most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."[7] *Delgado,* 466 U.S. at 216.

¶ 24. The Supreme Court has very recently added to its "seizure" jurisprudence in *United States v. Drayton,* 536 U.S. 194, 122 S.Ct. 2105 (2002). *Drayton*

---

[7] Although the defendants do not argue voluntariness here, we note that there is no Fourth Amendment requirement that consent searches be preceded by a warning that the subject has a right to refuse or is free to go in order for the consent to be recognized as voluntary. *Ohio v. Robinette,* 519 U.S. 33, 39–40 (1996); *see also Schneckloth v. Bustamonte,* 412 U.S. 218, at 232–33 (1973). This principle was just affirmed in *United States v. Drayton,* 536 U.S. 194, 122 S.Ct. 2105, 2113 (2002).

involved the issue of drug and weapons interdiction on buses. *Id.* at 2108. The defendants were passengers on a Greyhound bus. At a scheduled stop in Tallahasse, the bus was boarded by local police, who proceeded to question the passengers and ask for consent to search their luggage. *Id.* at 2109. The defendants were questioned, gave consent to searches of their luggage and persons, and were found to be carrying cocaine. *Id.* at 2110.

¶ 25. The Supreme Court concluded that the defendants were not "seized" for purposes of the Fourth Amendment. *Id.* Citing *Bostick,* the Court held that "[e]ven when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *Id.* The Court noted that the officers were armed and displayed their badges, and that one of them positioned himself at the front of the bus, but that their conduct was otherwise not intimidating—no guns were drawn, no commands issued, no show of force made. *Id.* at 2112. Accordingly, the Court held that the circumstances did not amount to a seizure. *Id.*

■

¶ 26. It is quite clear based upon the established evidentiary facts in this case that the traffic stop had concluded before Fetherston questioned Williams about contraband in the car and asked for permission to search. Fetherston told Williams he would be free to go after he signed the warning citation; Williams did so, and the citation was handed to him. Fetherston had already returned Williams' driver's license and rental papers. Fetherston said, unequivocally, "[w]e'll let you get on your way then okay." Fetherston and Williams

14

shook hands and exchanged common parting pleasantries ("have a good day" and "take care, we'll see you"), and turned away from each other, at least momentarily.

¶ 27. Indeed, the circuit court made the following finding: "it is clear that, at least verbally, the trooper had given the defendant permission to be on his way." Accordingly, the court of appeals properly focused its analysis on the events at the conclusion of the initial seizure, and immediately thereafter.[8] Like the court of appeals, we see the case as calling for a determination of whether Williams was seized *after* the conclusion of the original traffic stop, when he was questioned about contraband and asked for permission to search.

¶ 28. This requires, as noted above, consideration of all the circumstances and application of an objective "reasonable person" standard. We know that questioning alone does not a seizure make, and the fact that this defendant—perhaps like most people—spontaneously and voluntarily responded to the officer's questions is

---

[8] This case does not, therefore, present a question of whether the officer impermissibly exceeded the scope of or prolonged the initial seizure in violation of the Fourth Amendment. *See State v. Griffith,* 2000 WI 72, 236 Wis. 2d 48, 613 N.W.2d 72 (noting that a reasonable seizure can become an unreasonable one if the officer's investigation extends beyond that which is related to the purpose of the stop, but holding that mere identification questions asked of a passenger do not make a seizure unreasonable); *State v. Betow,* 226 Wis. 2d 90, 94, 593 N.W.2d 499 (Ct. App. 1999) (holding that "the scope of the officer's inquiry, or the line of questioning, may be broadened beyond the purpose for which the person was stopped only if additional suspicious factors come to the officer's attention . . . ."); *State v. Gaulrapp,* 207 Wis. 2d 600, 558 N.W.2d 696 (Ct. App. 1996) (traffic stop not unreasonably prolonged by question about contraband in the car and subsequent request for consent to search).

not enough to transform an otherwise consensual exchange into an illegal seizure. *Delgado,* 466 U.S. at 216; *Drayton,* 536 U.S. at ___, 122 S.Ct. at 2112–13. We conclude that a reasonable person in these circumstances would not have considered himself compelled to stay and answer the officer's questions. Stated positively, a reasonable person would have felt free to decline to answer the officer's questions and simply "get on [his] way."

¶ 29. That the officer had just invited Williams to "get on [his] way" strongly influences our conclusion. The officer's words and actions, considered as a whole, communicated permission to leave, as the traffic stop was over. The officer did nothing, verbally or physically, to compel Williams to stay. That Williams stayed, and answered the questions, and gave consent to search, is not constitutionally suspect, and does not give rise to an inference that he must have been compelled to do so. *Mendenhall* specifically rejected this argument. *Mendenhall,* 446 U.S. at 555–56.

¶ 30. The court of appeals was persuaded that the following circumstances combined to constitute a seizure: the tone, tenor, and rapidity of Fetherston's questioning; the presence and stance of the back-up officer, whose squad lights were still flashing; the location; and the time of night. We disagree.

¶ 31. It is true that Fetherston's questions came hard on the heels of the conclusion of the traffic stop, and that he used a somewhat louder and more assertive tone. But apart from the "Hey, Lawrence," which was spoken at a higher volume, the officer essentially continued to maintain a normal speaking voice. The questions were not accusatory in nature. The exchange was largely non-confrontational; indeed, there was sympathetic small talk as Mathews was being assisted with

his crutches immediately after consent to search was granted. The change in tone and tenor was not so significant in degree that the officer's questions took on the character of an official command, suggesting that compliance was required.

¶ 32. Furthermore, the presence and behavior of the back-up officer was not so intimidating as to convert this consensual exchange into a seizure. Staber stood nearby, on the passenger side of Williams' car, with a flashlight in his right hand and his left hand resting on his belt. That his left hand was therefore near his weapon is not remarkable, unless we are willing to say that the mere presence of an armed back-up officer always tips the scales toward a finding of a seizure. *See Drayton*, 536 U.S. at ___, 122 S.Ct. at 2112 ("That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."). *Mendenhall* made reference to the "threatening presence of several officers," the "display of a weapon by an officer," or the "physical touching of the person of the citizen" as factors suggesting that compliance with an officer's request is required. Here, the officers did not display their weapons or physically touch Williams, nor can their presence be characterized as "threatening."

¶ 33. That the emergency lights on Staber's squad were activated does not make a significant difference. Staber's squad was parked behind Fetherston's, and Fetherston's emergency lights were off. In any event, officers conducting traffic stops often leave their emergency lights on until everyone has left the scene, presumably for reasons of safety. This factor does not suggest that Williams was required to remain after the traffic stop had concluded.

¶ 34. Finally, the location and time of night did not materially contribute to a coercive atmosphere so as to transform the officer's questioning into a seizure. True, it was 2:30 in the morning on a rural section of the interstate. But there was plenty of traffic, so the situation was not as isolating and desolate as it might otherwise seem. Besides, it is not entirely clear why police questioning on the shoulder of a rural interstate at night should be considered inherently more coercive than police questioning in other situations. The suggestion is made that fear of unscrupulous or illegal police tactics is necessarily heightened under these circumstances; we decline to elevate this subjective suggestion to objective status under the "reasonable person" test.

¶ 35. Accordingly, we conclude that the totality of the circumstances establish that a reasonable person would have felt free to decline the officer's questions and leave the scene, or otherwise terminate the encounter. Williams was free to leave when Fetherston returned his driver's license and rental paperwork, gave him the warning citation, and said "we'll let you get on your way then okay." Fetherston's subsequent questioning, considered in the context of all the circumstances and against the objective, "reasonable person" standard, did not constitute a seizure for purposes of the Fourth Amendment. Accordingly, Williams' consent to the vehicle search was not invalid, and the evidence obtained in the search should not have been suppressed. The decision of the court of appeals is reversed.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 36. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(dissenting).* I agree with the circuit court and the court of appeals in concluding that a reasonable

motorist under the circumstances of the present case would not have felt free to refuse to answer the officer's questions and would not have felt free to get into his or her car and leave the scene.[1] It makes no difference whether the seizure is conceived of as an unreasonable extension of the initial traffic stop, or alternatively, a second seizure beginning with the state trooper's line of questioning after issuing the warning citation.[2]

¶ 37. Professor LaFave has it right: courts are engaging in nothing more than a legal fiction when they say that motorists under these circumstances have consented to the encounter and interaction.[3] Therefore, I dissent.

¶ 38. I agree with U.S. Supreme Court Justice David Souter, who stated in *United States v. Drayton,* 536 U.S. 194, 122 S.Ct. 2105 (2002) (Souter, J., dissenting), that "a display of power rising to [a] threatening level may overbear a normal persons [sic] ability to act freely, even in the absence of explicit commands or the formalities of detention."[4] Under the display of police power in the present case, what reasonable person would believe that "he stood to lose nothing if he refused to cooperate with the police, or that he had any

---

[1] *United States v. Mendenhall,* 446 U.S. 544, 554 (1980), sets forth this reasonable person test.

[2] *State v. Robinette,* 685 N.E.2d 762 (Ohio 1997) (taking second seizure approach on remand from U.S. Supreme Court).

[3] 4 Wayne R. LaFave, *Search and Seizure* § 9.3(a), at 95–96 (3d ed. 1996).

[4] *United States v. Drayton,* 536 U.S. 194, 122 S.Ct. 2105 (2002) (Souter, J., dissenting).

free choice to ignore the police altogether. No reasonable [person] could have believed that, only an uncomprehending one."[5]

¶ 39. In the present case, the officers effectively displayed both their power and their accoutrements of authority. The traffic stop occurred at 2:30 a.m. on a rural part of the interstate highway. Two patrol cars were at the scene, one with its emergency lights activated. One officer, a sheriff's deputy, stood at the ready by the passenger door. Another officer, a state trooper, presented the driver with a warning citation for speeding. The state trooper was trained as an "interdiction instructor." His goal was to obtain the driver's consent to search the vehicle.

¶ 40. After the state trooper issued the warning citation, he told Williams, probably much to Williams' relief, "We'll let you get on your way then. Take care. We'll see ya." Immediately thereafter, the state trooper asked Williams a series of questions regarding whether weapons, drugs, and large amounts of money were in the vehicle. The questioning culminated in a request to Williams for permission to search the vehicle. What reasonable motorist would feel free to walk away as the officer continues to address them? Under the circumstances of the present case, what reasonable motorist would feel free to ignore the questioning of the state trooper, get in his or her vehicle, and then leave the scene? Empirical studies show that most people believe they are validly in a police officer's custody so long as the police officer continues to interrogate them.[6]

---

[5] *Id.*

[6] 4 Wayne R. LaFave, *Search and Seizure* § 9.3(a), at 112 (3d ed. 1996).

¶ 41. Not only was there a display of power by the police, but there also was a seamless series of events with no real break between the detention during the traffic stop and the request for consent to search the vehicle. A reasonable motorist would not have detected the transition from detention to non-detention, from the traffic stop to a series of questions that they need not answer, and from the questioning to a request for consent to search the vehicle. Reasonable motorists would have thought that they were subject to police restraint at all times.[7]

---

[7] For cases so holding, with similar circumstances, see, for example, *Padilla v. Miller,* 143 F.Supp.2d 453, 468 (M.D.Pa. 1999) (informing driver of vehicle that he was free to leave did not convert the stop into a consensual encounter when officer immediately thereafter told driver he wanted to ask him more questions); *United States v. Mota,* 864 F.Supp. 1123, 1128 (D.Wyo. 1994) (returning papers to driver following traffic stop absent other words or gestures of closure provided no way for reasonable listener to conclude that the reason for detention was over and a consensual encounter was beginning); *State v. Hadley,* 932 P.2d 1194, 1197–98 (Ore. Ct. App. 1997) (traffic stop continues until the motorist has had an objectively and distinct real time opportunity to move on, meaning there must be a temporal break in the action between an officer's indication that a motorist is free to go and any unrelated inquiries); *Commonwealth v. Freeman,* 757 A.2d 903, 907–08 (Pa. 2000) (police officer illegally seized defendant following traffic stop after stating she was free to leave, returning to his patrol car, and then again approaching the defendant's car and asking her consent to search the car when no reasonable suspicion existed; "although these events occurred after express conferral of advice that [the defendant] was free to depart, they would have suggested to a reasonable person that such advice was no longer operative"); *Commonwealth v. Sierra,* 723 A.2d 644, 646–47 (Pa. 1999) (police officer's repeated questioning of the driver of stopped vehicle with same question after having returned

¶ 42. Beyond the display of power and the seamless series of events, the state trooper in the present case skillfully manipulated the circumstances in order to prevent any opportunity for Williams to refuse the officer's requests. The majority opinion gives no weight to the type of law enforcement technique used in the present case.

¶ 43. The state trooper had "a Badger going."[8] As the state trooper explained at the suppression hearing, a "Badger stop" is an interdiction stop where a law enforcement officer attempts to obtain a driver's consent to search a car for possible criminal activity. A "Badger stop" obviously takes advantage of the fact that motorists think that they are obliged to answer questions and not to leave the scene. Ordinarily, a court does not concern itself with the subjective intent of law enforcement officers when it determines whether a violation of the Fourth Amendment has occurred.[9] The officer's subjective intent is important here, however, because the whole point of the "Badger stop" is to make a reasonable motorist think he has to respond and consent even though as a matter of law the motorist is free to go.

¶ 44. In light of the state trooper's role, I find the reasoning of the circuit court especially persuasive. The

driver's license and issued warning for speeding was investigative detention); *State v. Ballard,* 617 N.W.2d 837, 841 (S.D. 2000) (police officer had illegally seized defendant following traffic stop after stating that she was free to leave, then asking her consent to search the car; when she refused telling her he would detain her vehicle until a drug dog was summoned).

[8] *See* majority op. at ¶ 7.

[9] *State v. Wallace,* 2002 WI App 61, ¶ 13, 251 Wis. 2d 625, 642 N.W.2d 549; *Strickler v. Commonwealth,* 757 A.2d 884, 893, (Pa. 2000) (officer's subjective intentions irrelevant).

circuit court concluded that "[i]t is unreasonable to suspect that under [these] circumstances any citizen would think that he or she had a right to be uncooperative .... It cannot be expected that every citizen be a lawyer."[10] In the words of another state supreme court, I am "concerned with the dubious message we send to law enforcement officers and the public if we validate a procedure allowing officers to falsely tell traffic offenders they are free to go, only for the purpose of eliciting their uncoerced agreement to search their automobiles."[11]

¶ 45. Law enforcement officers are apparently being trained to use a "Badger stop" to trick motorists into giving up their rights. The state trooper in the present case who was an "interdiction instructor" videotaped the entire interdiction. Perhaps the videotape will be used to teach this technique to other law enforcement officers. Shouldn't the public be educated about their rights to refuse to answer police questions and their rights to refuse to consent to a search of their vehicles?

¶ 46. As I wrote in *Jennings*,[12] and express here again, trickery on the part of law enforcement officers undermines public trust in law enforcement, the courts, and the law as an institution. In order for law enforcement and the courts to be successful in carrying out their responsibilities, they must have the cooperation, trust and confidence of the public.

¶ 47. For the reasons stated, I dissent.

¶ 48. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

[10] Majority op. at ¶ 15.

[11] *State v. Ballard,* 617 N.W.2d 837, 842 (S.D. 2000).

[12] *State v. Jennings,* 2002 WI 44, 252 Wis. 2d 228, 647 N.W.2d 142 (Abrahamson, C.J., dissenting).