STATE of Wisconsin, Plaintiff-Respondent,

v.

Jason M. JACOBS, Defendant-Appellant.†

Court of Appeals

*No. 2011AP1852–CR. Submitted on briefs May 11, 2012. —Decided August 1, 2012.*

2012 WI App 104

(Also reported in 822 N.W.2d 885.)

† Petition for Review denied 11-14-12.

142

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Mark S. Rosen* of *Rosen and Holzman, Ltd.* of Waukesha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sally L. Wellman*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Brown, C.J., Neubauer, P.J., and Reilly, J.

¶ 1. BROWN, C.J. Jason M. Jacobs was found guilty of homicide by use of a vehicle with a prohibited

147

alcohol concentration and with a detectable amount of a restricted controlled substance contrary to WIS. STAT. § 940.09(1)(am) and (b) (2009–10)[1] after he ran a stop sign and collided with another car on November 14, 2008. He argues that the trial court wrongfully denied his motion to suppress the blood test results because he did not voluntarily give his consent. But the closer issue is whether his trial counsel was ineffective for failing to object to what amounted to character testimony of the deceased by the victim's mother regarding the victim's personal history at trial. We hold that such testimony was blatantly irrelevant. But we see no prejudice by the failure to object because of the overwhelming relevant evidence of Jacobs' guilt. We also hold that the facts found by the trial court show that Jacobs voluntarily consented to a blood draw. We affirm.

## BACKGROUND

¶ 2. On November 14, 2008, at 7:03 a.m., Jacobs ran a stop sign and crashed into another vehicle, killing the driver. From that point until Jacobs' arrival at the hospital for a blood draw, the facts are mostly undisputed. At the scene of the accident, police took Jacobs' driver's license and his cell phone. Jacobs was asked whether he had consumed any drugs or alcohol, which he denied, and then he completed a full range of field sobriety tests. There were a few indicia of impairment in both the horizontal and vertical gaze nystagmus tests. But the officer who performed the tests testified that he would not have placed Jacobs under arrest based upon his observations.

---

[1] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

¶ 3. After Jacobs was informed that someone had died as a result of the collision, he stated that he did not want to talk about the crash without consulting an attorney. Police told him that was fine, but asked Jacobs if he would take a blood test at a hospital to determine whether there were any drugs or alcohol in his system. Jacobs agreed to take the test after an officer went over the advantages and disadvantages of taking the test.

¶ 4. Jacobs then rode in the squad car to the hospital. The record indicates that his sister, who was at the scene by this point, offered to give him a ride, but the police expressed a preference for him to ride in the squad car. There is no indication in the record that Jacobs actively objected to riding in the squad car, but he did testify that he did not feel he had the choice to ride with his sister. Before getting in, however, Jacobs was told that he was not under arrest and was free to leave at any time.

¶ 5. During the twenty-minute ride to the hospital, Jacobs used the squad car's phone to call an attorney. The attorney advised Jacobs not to make any further statements or take any tests. When Jacobs informed the deputy driving the squad car of this advice, the deputy reiterated to Jacobs that he was not under arrest or required to take any tests. At the hospital, Jacobs, his fiancée,[2] the deputy who transported him and a drug recognition expert (D.R.E.) officer conferred in the hospital lobby. After a brief discussion, they all moved to an examination room.

¶ 6. The testimony of Jacobs' and the State's witnesses diverge after Jacobs was moved into the

_____

[2] Parts of the record refer to Jacobs' girlfriend, but Jacobs' brief refers to his fiancée. The distinction has no bearing on our analysis, so we refer to her as Jacobs does.

examination room. We will give Jacobs' account first and then follow it up with the officers'. According to Jacobs, after he refused to take any tests based on his attorney's advice, the D.R.E. officer left the room for "at least a half hour." Jacobs testified that during that time, he asked the deputy still in the examination room what was taking so long. The deputy then left the room to check with the D.R.E. officer.

¶ 7. Jacob claimed that, when the deputy returned, he indicated that there was a problem with the vertical nystagmus test. The deputy also allegedly stated, "I'm not really supposed to tell you this . . . but when you are involved in an accident where somebody is seriously injured or somebody dies, if you don't volunteer to take that test . . . we can arrest you." The deputy explained that if that were to happen, Jacobs would lose his license immediately and they would take the blood draw anyway. When both the deputy and the D.R.E. officer were back in the examination room, they exchanged glances and the D.R.E. officer reiterated a similar message. They also mentioned that it would "look[] better" if Jacobs volunteered.

¶ 8. Jacobs testified that he ultimately agreed to the draw after refusing three times and after the officers' statements that he would otherwise be arrested and lose his license. He stated that he consented because "it didn't matter at that point"; they were either going to take his blood based on his consent or based on his arrest. He did not want to be arrested, so he agreed to the draw. Jacobs' fiancée more or less corroborated Jacobs' testimony, stating that he agreed to the draw after refusing "a dozen" times in what she described as a "pretty intense" exchange.

¶ 9. The testimony of the two officers regarding the events at the hospital contrasted sharply with

150

Jacobs' and his fiancée's. The D.R.E. officer testified that after talking on the phone with his lieutenant at the nurses' station, it was decided that he would return to the room and simply ask Jacobs if he would voluntarily consent to a draw. According to the D.R.E. officer, he did so and Jacobs nodded "yes" in response, which he then verbally confirmed. Both officers deny telling Jacobs it would look better if he consented, or that if he did not consent, he could be arrested and the draw would happen anyway. The deputy testified that he reminded Jacobs that he was not under arrest at least twice after arriving at the hospital—once when Jacobs asked for permission to use the restroom and again when he asked permission to use a cell phone. Both times, he was told that he did not have to ask because he was not under arrest. Although the D.R.E. officer acknowledged that he would not have let Jacobs leave prior to talking to his lieutenant, there is no indication in the record that this information was communicated to Jacobs.

¶ 10. After Jacobs agreed to the blood draw, he attempted to contact his attorney one more time prior to the draw, but the attorney did not answer the phone. Jacobs then signed two forms: A Consent to Search form which was altered to provide for a search of Jacobs' blood and the Consent for Drawing Legal Blood Alcohol Levels or Controlled Substances hospital form. The first form stated that Jacobs could refuse to consent to the search. The second form stated that the patient whose name "appears below . . . has been arrested for drunk driving." Jacobs testified that he did not read either form. Shortly after Jacobs signed the forms, and about three hours after the accident, Jacobs' blood was drawn. As we already noted, the results showed the presence of alcohol and a cocaine metabolite in Jacobs' bloodstream.

151

¶ 11. Based on the results of the draw, Jacobs was charged with homicide by use of a vehicle while operating with a prohibited blood alcohol concentration and with a detectable amount of a restricted controlled substance in his blood. *See* WIS. STAT. § 940.09(1)(am), (b). He moved to suppress the blood test evidence, arguing that his consent was involuntary. After a hearing, the trial court concluded that Jacobs freely and voluntarily gave blood against the advice of his attorney in an attempt to cooperate with officers. As part of that decision, the trial court determined that the officers' version of what happened at the hospital was credible and that a reasonable person would have felt free to leave at any time based on the credible evidence presented. The court emphasized that Jacobs had clearly remained at the hospital in an effort to be cooperative and helpful.

¶ 12. The case then went to trial. The State called the victim's mother, who was not present at the scene of the accident, as one of its witnesses. She testified about the victim's childhood, employment, and history of helping out on the family farm. She told the jury that he was an extremely hard worker and did the morning chores on the family farm before leaving to go to work and what was left of the chores when he got home. She also testified about his long-term relationship with his wife, his high school sweetheart, whom he had married just a month before his death. Then, she testified that since his death, the family had been forced to close down one of its barns.

¶ 13. In closing argument, the State highlighted some of the mother's testimony:

> Tim [] is dead .... Ken and Shirley [] lost a beloved son. Jeannie lost a beloved husband. Ken lost a partner

on his farm, lost a man who likely would have continued their legacy on the family farm.

Obviously, Tim lost everything. He was a man just in the blooming part of his life, had just gotten married. He knew what he was going to do with his life. He wanted to have children. He is never going to have a chance to be a father, a grandfather, never going to get a chance to see his kids graduate from high school, never going to get a chance to tuck them in, to continue the family farm. All those opportunities are blown . . . .

Jacobs' attorney never objected to the mother's testimony nor to the portion of the State's closing argument referencing it.

¶ 14. Other than the victim's mother's testimony, the jury, of course, heard the evidence from the blood draw. An expert testified that although Jacobs had a blood alcohol level just under the legal limit three hours after the accident, it would have been over the limit at the time of the accident. The jury also heard eyewitness testimony that Jacobs did not slow down before entering the intersection against the stop sign. That same witness also testified that once she arrived at the aftermath of the accident, she asked Jacobs whether he had seen the stop sign and Jacobs stated that he had not. In addition, a supervisor from the Washington county crash reconstruction unit opined that based on his investigation, Jacobs' car would have been traveling at approximately forty-five miles per hour when it collided with the victim's car.

¶ 15. Jacobs' primary defense at trial, according to his brief, was that the death would have occurred even if Jacobs had been exercising due care and had not had alcohol or the cocaine metabolite in his bloodstream. In support of that defense, he highlighted the fact that Jacobs passed the majority of his field sobriety

tests and he called an expert to cast doubt on the State's expert testimony regarding the blood alcohol level at the time of the accident. But even Jacobs' expert acknowledged that Jacobs would have been over the legal limit at the time of the accident. In addition, Jacobs presented evidence that the victim was speeding at the time of the accident and argued that if the victim had not been speeding, he would not have been in the intersection at the time of the collision. The jury found Jacobs guilty on both counts and he was subsequently sentenced.

¶ 16. Jacobs filed a postconviction motion alleging that his trial counsel was ineffective for failing to object to the victim's mother's testimony. The trial court denied the motion without conducting a *Machner*[3] hearing, emphasizing that if trial counsel had objected, he would have run the risk of swaying the jury against the defendant and the evidence would have been allowed anyway. Jacobs now appeals both the denial of his motion to suppress and the denial of his postconviction motion.

## DISCUSSION

### *Motion to suppress*

¶ 17. We will first discuss the motion to suppress, which we consider to be the less problematic of the two issues. The standard of review for Jacobs' motion to suppress is twofold. First, we examine the trial court's findings of historical fact under the clearly erroneous standard and then review de novo the application of

---

[3] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

constitutional principles to those facts. *See State v. Vorburger*, 2002 WI 105, ¶¶ 32, 88, 255 Wis. 2d 537, 648 N.W.2d 829. When looking at the trial court's findings of fact, we must accept the fact finder's credibility determinations unless the testimony relied upon is incredible as a matter of law. *State v. Berggren*, 2009 WI App 82, ¶ 18, 320 Wis. 2d 209, 769 N.W.2d 110. In other words, only when testimony is inherently or patently incredible will this court substitute its judgment for that of the fact finder. *See Day v. State*, 92 Wis. 2d 392, 400, 284 N.W.2d 666 (1979).

■■■

¶ 18. "[A] search authorized by consent is wholly valid *unless* that consent is given while an individual is illegally seized." *State v. Hartwig*, 2007 WI App 160, ¶ 11, 302 Wis. 2d 678, 735 N.W.2d 597 (citation omitted). A person has been seized within the meaning of the Fourth Amendment if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. *State v. Williams*, 2002 WI 94, ¶ 4, 255 Wis. 2d 1, 646 N.W.2d 834. Consent given when an individual is not illegally seized must still be voluntary, or a "free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied." *Hartwig*, 302 Wis. 2d 678, ¶ 7 (citation omitted). When determining voluntariness, a court considers " 'the circumstances surrounding the consent and the characteristics of the defendant,' and determines whether the State has proven by clear and convincing evidence that the consent was voluntary." *Vorburger*, 255 Wis. 2d 537, ¶ 89 (citation omitted).

■■

¶ 19. All of Jacobs' arguments depend on his version of what happened at the hospital being accepted by

the court as the truth. Therefore, since the trial court found the officers' testimony as to the events leading to Jacobs' decision to comply with the draw to be credible, his argument must be that the officers were incredible as a matter of law.[4] *See Berggren*, 320 Wis. 2d 209, ¶ 18. Specifically, Jacobs takes issue with the testimony that he voluntarily consented to the blood draw against his attorney's advice without the officers threatening to arrest him and draw his blood if he did not consent. He argues that since it is undisputed that his attorney advised him not to take the test and that he refused to take the test based on that advice before he consented, the officers' version of the story simply does not make sense. We disagree.

¶ 20. In order to be "inherently or patently incredible," evidence must be "in conflict with nature or fully established or conceded facts." *Day*, 92 Wis. 2d at 400 (citations omitted). The trial court pointed to one plausible scenario—that Jacobs ultimately changed his mind and agreed to a blood test against his attorney's advice because he wanted to be cooperative and help with the investigation. Because the trial court's answer to Jacobs' argument is not contrary to fully established or conceded facts or in conflict with nature, we reject Jacobs' involuntary consent claim.

¶ 21. Now, having dispatched Jacobs' nonconsent claim, we next decide Jacobs' argument that he was illegally seized when he was driven to the hospital in a

---

[4] The trial court did not explicitly find Jacobs' testimony to be incredible, but rather hypothesized that his version of what happened could have been based on a "misunderstanding of something said" by police or "an explanation used by the [d]efendant to defend his decision to submit to the draw."

squad car and therefore his consent was invalid.[5] He appears to claim that he had no choice but to ride in the squad car rather than accept the offer by his sister to give him a ride. As the State points out, at the time the decision to ride in the squad car was made, Jacobs had given his initial consent to the blood draw. Based on that consent, it made sense that the police would want to transport him to the hospital in a controlled environment rather than letting him ride with his sister. Jacobs does not claim that he asked the officers if he could ride with his sister but was refused. He only claims that he did not think he had a choice. The fact that he was allowed to call his attorney while in the squad car demonstrates that he was free to go about his business. Moreover, his own testimony that he changed his mind

---

[5] Both the State and Jacobs assume that, but for the finding that Jacobs consented to ride to the hospital in the police car of his own volition, the seizure would have been illegal. *See State v. Hartwig*, 2007 WI App 160, ¶¶ 11–13, 302 Wis. 2d 678, 735 N.W.2d 597 (a search authorized by consent is valid unless given while an individual is illegally seized). We have our doubts. In our view, the police had probable cause to at least arrest Jacobs for homicide by negligent operation of a vehicle based on his involvement in a fatal accident just after running a stop sign at highway speeds. *See* Wis. Stat. § 940.10. Although the police clearly did not believe they had probable cause to arrest Jacobs when they took him to the hospital, we have previously held that the legality of an arrest does not depend on whether the arresting officer articulates the correct legal basis for the arrest. *State v. Repenshek*, 2004 WI App 229, ¶ 10, 277 Wis. 2d 780, 691 N.W.2d 369. If Jacobs' alleged seizure and/or arrest was legal, then "custody is one factor to be considered in determining voluntariness," but "it is not in itself dispositive." *See Hartwig*, 30 Wis. 2d 678, ¶ 13 (citation omitted). Nonetheless, we will address the issues as they were framed by the parties —assuming that if Jacobs was seized, he was seized illegally, and the resulting consent to take the test would be invalid.

about taking the blood test once he was at the hospital sounds like a person who knew he had choices. We see no seizure here.

■

¶ 22. Jacobs next contends that he was effectively placed in custody or seized while at the hospital. More specifically, Jacobs argues that his removal from the lobby to an examination room, combined with the continual presence of officers in that room, implied that he was in custody and that he was not free to leave. But those allegations are contradicted by testimony from the deputy present in the examination room that, on more than one occasion, Jacobs was reminded that he was not under arrest and did not have to ask permission to go about his business.[6] Taking the officers' version of events as true, as we must, we agree with the trial court that a reasonable person in Jacobs' position would have believed that he or she was free to leave the hospital at any time.[7]

---

[6] Yet again, these allegations are contradicted to some degree by Jacobs' own testimony. As we noted in the body of this opinion, Jacobs testified that the deputy went to check in with the D.R.E. officer who was out of the room talking on the phone. There is no indication in the record that other officers or hospital staff were present. So, presumably, there would have been at least a short window of time when no one was blocking the exit to the examination room. Such a circumstance hardly presents a seizure scenario.

[7] Jacobs likens his case to *State v. Luebeck*, 2006 WI App 87, 292 Wis. 2d 748, 715 N.W.2d 639, and *Florida v. Royer*, 460 U.S. 491 (1983), both of which involved illegal seizures. He points to specific facts in those cases that he insists show similarity to this case—the police retaining the defendant's identification after he passed field sobriety tests in *Luebeck*, and the police moving the defendant to a private room and retaining his driver's license in *Royer*. *See Luebeck*, 292 Wis. 2d 748,

158

¶ 23. We now move to what we consider to be the more troubling issue—Jacobs' ineffective assistance of counsel claim. Criminal defendants have a Sixth Amendment right to effective assistance of counsel. In order to obtain relief based on ineffective assistance of counsel, the defendant must demonstrate that trial counsel's performance was deficient and that the deficient performance was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance requires a defendant to show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Prejudice is shown by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.*

¶ 24. In this case, as we have already related, Jacobs' motion for postconviction relief based on ineffective assistance of counsel was denied without a

¶¶ 15–16; *Royer*, 460 U.S. at 494. However, the test for whether a person has been seized requires us to look at the totality of the circumstances. *See State v. Williams*, 2002 WI 94, ¶ 4, 255 Wis. 2d 1, 646 N.W.2d 834. And when we do, this case is nothing like either *Royer* or *Luebeck*. For example, before the alleged seizure, Jacobs expressed a willingness to cooperate with police and gave initial consent to have his blood drawn. In addition, he was allowed to call his attorney twice before the draw. All of those facts, not present in *Royer* or *Luebeck*, support the trial court's conclusion that Jacobs agreed to the draw in an effort to be helpful after his involvement in a fatal accident.

*Machner* hearing. Therefore, the question we must answer is whether his postconviction motion alleged facts that, if proven, show that he was entitled to relief on his ineffective assistance of counsel claim. *See State v. Balliette*, 2011 WI 79, ¶ 18, 336 Wis. 2d 358, 805 N.W.2d 334, *cert. denied,* 132 S. Ct. 825 (2011). Sufficiency of the motion is a question of law which we review de novo. *See id.* If the motion does not raise facts that entitled the defendant to relief, "or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief," the grant or denial of the motion is a matter of discretion entrusted to the trial court.[8] *Id.* (citations omitted).

¶ 25. As we already stated, counsel's alleged deficiency in this case was his failure to object to the mother's extensive background testimony which referenced the victim's character. The trial court found that there was no deficient performance because it did not "think that many . . . criminal defense attorneys would have objected to that line of testimony." It reasoned that

> [c]utting off the mother of the decedent in a case of this type, seeking to prevent her from providing biographical information, may well come back to haunt a defendant from the standpoint of his remorse in the eyes of the jury as much or more than the defendant argues that the testimony did.

The trial court went on to state that "had [Jacobs' attorney] objected, this [c]ourt would have allowed the testimony."

---

[8] Neither party argues that the trial court's discretion was not properly exercised in this case, instead focusing on whether Jacobs can show deficient performance and prejudice.

160

¶ 26. We begin by pointing out that the mother's testimony was not admissible because it was not relevant. *See* Wis. Stat. §§ 904.01, 904.02. To be relevant, evidence must "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Sec. 904.01. In order to convict Jacobs of a violation of Wis. Stat. § 940.09(1)(am) or (b), the State had to prove the following: (1) that the defendant operated a vehicle, (2) that the defendant's operation of a vehicle caused the death of the victim, and (3) that the defendant had a prohibited alcohol concentration (for § 940.09(1)(b)) or a detectable amount of a restricted controlled substance (for § 940.09(1)(am)) in his or her bloodstream at the time the defendant operated the vehicle. *See* Wis JI—Criminal 1186–87; *see also State v. Heft*, 185 Wis. 2d 288, 296–97, 517 N.W.2d 494 (1994). While much, if not all, of the mother's testimony regarding the victim's character may have been relevant at the sentencing stage, nothing about the victim's personal history was relevant to Jacobs' guilt in this case.

¶ 27. Jacobs' appellate counsel seems to agree, at least in part, with the position taken by the prosecution at the trial stage regarding this issue. In response to the postconviction motion, the prosecution argued that much of the mother's testimony would have been admissible under Wis. Stat. § 908.045(5m), which is a hearsay exception that applies to certain "statement[s] of personal or family history" of unavailable witnesses.[9]

---

[9] Because Jacobs' appellate counsel, counsel representing the State at the postconviction motion, and the trial court all seem to have accepted this hearsay exception as an avenue

Appellate counsel wrote that "some" of her testimony may have been admissible under this statute. Thus, we feel compelled to point out that hearsay exceptions do not operate in a vacuum such that if testimony falls under a hearsay exception it will be admissible no matter what. WISCONSIN STAT. § 904.02 unambiguously states that "[e]vidence which is not relevant is not admissible." In other words, before even entertaining the question of whether proffered evidence is hearsay or falls under a hearsay exception, courts must engage in an analysis of whether the evidence is relevant, unless, of course, relevancy is obvious and not at issue. *See* RALPH ADAM FINE, FINE'S WISCONSIN EVIDENCE 63–64 (2d ed. 2008) ("[Section] 904.02 makes [WIS. STAT. §] 904.01 the main gate through which all evidence seeking admission at trial must pass."). In this case, because testimony as to the victim's character and personal history were not relevant to Jacobs' guilt or innocence, the mother's testimony on those issues was not admissible regardless of the applicability of any hearsay exceptions.

through which at least some of the mother's character testimony could be admitted, we researched how WIS. STAT. § 908.045(5) and (5m) have been used in prior cases. Interestingly, we found that of the six cases in Westlaw's annotations to "personal or family history" cases related to § 908.045, five involved the use of testimony to establish paternity for the purpose of determining someone's heirs at law. The sixth used the testimony to establish that a joint tenant had passed away, thus passing his share of the property to the joint tenant who was still living. All six cases were decided before 1960. Looking for citations to § 908.045(5) and (5m), we found one 1998 unpublished criminal case where the court stated that subsection (5) could be used to allow someone to testify to the age of the daughter of the defendant, who was charged with contributing to the delinquency of a child by having her daughter help her shoplift. So, in every case we found the testimony was obviously relevant to the facts at issue in the case.

162

¶ 28. We are hesitant to endorse the trial court's determination, without a *Machner* hearing, that the decision was the result of reasonable trial strategy based on the jury's possible negative reaction to an objection. Although trial counsel enjoys a strong presumption of effective assistance, *Balliette*, 336 Wis. 2d 358, ¶¶ 25–26, "we cannot ratify a lawyer's decision merely by labeling it, as did the trial court, 'a matter of choice and of trial strategy,' " *State v. Felton*, 110 Wis. 2d 485, 502, 329 N.W.2d 161 (1983). Instead, "[w]e will in fact second-guess a lawyer if the initial guess is one that demonstrates an irrational trial tactic or if it is the exercise of professional authority based upon caprice rather than upon judgment." *Id.* at 503.

¶ 29. We fully understand that "[o]bjections tend to disrupt the flow of a trial, [and] are considered technical and bothersome by the fact-finder." *See State v. Campbell*, 630 N.E. 2d 339, 352 (Ohio 1994) (citation omitted). But possible jury reaction to an objection does not justify the failure to object in every instance. If it were otherwise, a failure to object would never be error. That cannot be the law.

¶ 30. Yes, when a defense attorney is surprised by a question and answer which is objectionable, and the jury has already heard the offending testimony, counsel must weigh the worth of the objection. But here, the State mentioned before trial that the mother was "going to testify briefly for identification purposes and *provide some information about the victim* in this case." (Emphasis added.) Thus, counsel should at least have been on the alert that potentially irrelevant and prejudicial information might be presented to the jury. There was opportunity to object and ask for a voir dire while the

jury was out and, alternatively, before the first question about the victim's character had been answered by the mother. Therefore, we are not comfortable with resolving this issue on the basis of trial strategy.

¶ 31. But we do not have to decide whether the failure to object was excusable because of trial strategy. This is because Jacobs must provide some basis to show how the ineffective assistance prejudiced him before he is entitled to a *Machner* hearing. *See Balliette*, 336 Wis. 2d 358, ¶ 18; *Strickland*, 466 U.S. at 687. In this case, the relevant, admissible evidence against Jacobs was overwhelming, more than enough to convince us that no jury would have been swayed by the mother's irrelevant testimony about her son's good character. Uncontroverted testimony showed that Jacobs ran a stop sign without stopping or slowing down and with alcohol and a cocaine metabolite in his bloodstream. Jacobs' argument that counsel's deficient performance was prejudicial boils down to this: because he presented a plausible affirmative defense that was rejected by the jury, the mother's testimony may have prejudicially swayed the jurors against him.

¶ 32. The problem with Jacobs' argument is that his affirmative defense at trial, based on Wis. Stat. § 940.09(2)(a), was not plausible. Section 940.09(2)(a) requires a defendant to "prove[] by a preponderance of the evidence that the death would have occurred even if he or she had been exercising due care and he or she had not been under the influence of an intoxicant [or] did not have a detectable amount of a restricted controlled substance in his or her blood." In other words, Jacobs needed to prove that the accident would have occurred regardless of whether he exercised due care or was intoxicated. Jacobs argues that he could have met

164

this defense in the jury's eyes based on evidence that he did not show signs of impairment at the accident scene immediately after the accident occurred and that running a stop sign does not in and of itself show lack of due care.

¶ 33. Jacobs' argument that he was not impaired and did exercise due care misses the mark. He simply did not exercise due care. He blew the stop sign. We agree with the State that "a person exercising due care does not run through a clearly visible stop sign." But for running the stop sign, the accident would never have occurred. Jacobs tries to turn the statutory affirmative defense on its head by evidence that the victim was speeding and, but for the speeding, the accident would not have happened. But regardless of this evidence, he cannot get around the fact that his running of the stop sign was a substantial factor in causing the collision, even if the victim's speeding was also a factor. There is no reasonable probability that, even if trial counsel had objected and even if the mother did not testify to her son's character, it would have made any difference.

*By the Court.*—Judgment and order affirmed.