COURT OF APPEALS
DECISION
DATED AND FILED

March 26, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP697-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF49

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ANDREW JASON PETERSON,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Bayfield County: JOHN P. ANDERSON, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Andrew Jason Peterson, pro se, appeals from a judgment, entered following a jury verdict, convicting him of homicide by

intoxicated use of a vehicle while having a prior intoxicant-related conviction. Peterson also appeals from the circuit court's order denying his motion for postconviction relief.

¶2      On appeal, Peterson claims: (1) his motion to suppress his blood test results should have been granted because he was denied a second blood test under Wisconsin's implied consent law; (2) his right to counsel was violated when the circuit court directed defense counsel not to discuss Peterson's ongoing testimony with him during an overnight recess; (3) he was denied his right to a fair and impartial jury; (4) he is entitled to a new trial in the interest of justice because the real controversy was not fully tried as a result of the prosecutor's misstatement of the affirmative defense to homicide by intoxicated use of a vehicle under WIS. STAT. § 940.09(2)(a) (2021-22);[1] and (5) his defense counsel was constitutionally ineffective in numerous respects. For the reasons that follow, we deny all of Peterson's claims.

## BACKGROUND

¶3      On June 10, 2017, at around 7:00 p.m., Peterson crashed his vehicle into a motorcycle, and the driver of the motorcycle—the victim—was pronounced dead at the scene. At trial, witnesses Paige Tahnk and John Helbig—both of whom were on a different motorcycle waiting at the intersection where the crash occurred—testified that Peterson had turned left in front of the oncoming motorcycle and hit it. In the aftermath of the accident, Tahnk reported that she heard Peterson talking on his cell phone, and he stated that he was "cleaning out

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[his] car right now." She testified that she then saw Peterson "taking empty bottles of booze and beer cans, or cans of things out of his car and putting them in his trunk."

¶4 Deputy Christopher Benton, with the Bayfield County Sheriff's Office, reported to the scene of the accident and spoke with Peterson. Benton asked Peterson if he had been drinking, and Peterson reported having one drink. According to Benton, he smelled alcohol on Peterson's breath. After speaking with Tahnk, Benton also discovered the alcohol bottles in Peterson's trunk and on the front passenger's side floorboard. Benton thereafter administered field sobriety tests, and Peterson agreed to submit to a preliminary breath test (PBT), which revealed a 0.22 blood alcohol concentration (BAC). Peterson asked to take a second PBT, which registered a 0.21 BAC. Peterson was arrested and transported to the hospital.

¶5 At the hospital, Benton read Peterson the required Informing the Accused form (hereinafter, the form) and requested a blood sample. Peterson agreed to the blood test, but he also asked "how he would make his own arrangements for the other test," which Benton took to mean the additional test at Peterson's own expense referenced on the form and in WIS. STAT. § 343.305(5)(a). Benton told Peterson that he "didn't know how to make those arrangements for him." Benton testified that Peterson did not mention the additional test again. Peterson's blood test revealed a 0.194 BAC.

¶6 The State charged Peterson with homicide by intoxicated use of a vehicle and homicide by use of a vehicle while having a prohibited alcohol concentration (PAC), both while having a prior intoxicant-related conviction. Pretrial, Peterson filed three motions to suppress his blood test results on the

grounds that there was no probable cause for the PBT and arrest, that he did not voluntarily consent to a blood draw, and that he was denied an additional blood test at his own expense. After an evidentiary hearing, the circuit court denied Peterson's motions.

¶7    The case proceeded to a four-day jury trial, where the State presented evidence that Peterson was at fault for the crash and that it occurred due to Peterson's intoxication. Peterson testified in his own defense. He claimed that the crash occurred as a result of his daughter's dog. According to Peterson, Tahnk and Helbig yelled, which caused the dog to leap toward the open driver's window, and the dog landed on his arm, causing his car to turn left into the motorcycle. Peterson admitted that he had not told law enforcement at the scene that the dog had caused the crash. Peterson's daughter, who was present in the vehicle, also testified consistent with her father's testimony about the dog, but she too admitted that she did not report the dog's interference to police.

¶8    Peterson further testified that he had only one drink before the crash. Outside the presence of the jury, however, the State played a jail call where Peterson admitted having three or four drinks before the crash. When the jury returned, Peterson admitted that he made that statement. However, he claimed that he made that admission only because he had heard the recording and that he did not actually remember making that statement.

¶9    Peterson's testimony occurred over the course of two days. After Peterson's first day of testimony, the circuit court and the parties discussed the court's standing sequestration order—prohibiting all witnesses from speaking to anyone, including attorneys, while they were testifying—and its application to Peterson during the overnight recess, while also recognizing Peterson's right to

counsel and that the court could not "prohibit [defense counsel] from talking to [Peterson] in general." *See Geders v. United States*, 425 U.S. 80, 91 (1976); *Perry v. Leeke*, 488 U.S. 272, 284-85 (1989). In response, defense counsel stated, "I'm more than happy to not talk about his testimony and not try to prepare him for cross if that's the [c]ourt's concern. I certainly can abide by that." The court confirmed that counsel could speak with Peterson "about things as long as [he did not] talk about his testimony," which included "[e]ither what [Peterson has] said or what he's going to say."

¶10 The jury found Peterson guilty of both counts as charged. The circuit court entered judgment for homicide by intoxicated use of a vehicle while having a prior intoxicant-related conviction and dismissed the PAC charge. *See* WIS. STAT. § 346.63(1)(c). The court sentenced Peterson to twelve years of incarceration, comprised of six years' initial confinement followed by six years' extended supervision.

¶11 Peterson moved for postconviction relief, seeking a new trial.[2] In his motion, Peterson alleged four bases for relief: (1) the circuit court erred by denying his suppression motions; (2) he was denied the right to counsel when the court ordered defense counsel not to discuss his ongoing testimony during the overnight break; (3) a juror was biased; and (4) his defense counsel was constitutionally ineffective. The court held a *Machner*[3] hearing, during which

---

[2] We will refer to the attorney who represented Peterson at trial as "defense counsel" and the attorney who represented Peterson postconviction as "postconviction counsel."

[3] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

Peterson, defense counsel, the juror, and Deputy Benton testified. The court denied Peterson's motion by written order.[4] Peterson appeals.

## DISCUSSION

### I. Motion to Suppress

¶12   First, Peterson argues that the circuit court erroneously denied his motion to suppress because he was refused an opportunity for an additional test under the implied consent law. WISCONSIN STAT. § 343.305(2) provides that a person operating a motor vehicle on a public highway in this state is deemed to have given "[i]mplied consent" to one or more tests of his or her breath, blood, or urine "for the purpose of determining the presence or quantity in his or her blood or breath, of alcohol, controlled substances, controlled substance analogs or other drugs, or any combination" thereof. At the time law enforcement asks an accused to submit to a test, the officer must read the form—prescribed by statute and generally referred to as the "Informing the Accused" form—to the accused. Sec. 343.305(4).

¶13   As relevant to this appeal, WIS. STAT. § 343.305(5)(a) refers to "additional tests" and an "alternative test"[5] and provides in pertinent part:

---

[4] After Peterson filed his notice of appeal, it came to light that "[t]hrough error, [postconviction] counsel for defendant did not effectuate successful filing of the reply brief" related to Peterson's postconviction motion. We remanded the case for "the circuit court to determine whether a reply brief, had it been filed, would have impacted the court's decision on the defendant's postconviction motion" and to decide postconviction counsel's motion to withdraw. The court held a hearing, during which it granted postconviction counsel's motion to withdraw, granted Peterson's request to proceed pro se, and afterward issued an amended order denying Peterson's postconviction motion.

6

> If the person submits to a test under this section, the officer shall direct the administering of the test. A blood test is subject to par. (b). The person who submits to the test is permitted, upon his or her request, the alternative test provided by the agency under sub. (2) or, at his or her own expense, reasonable opportunity to have any qualified person of his or her own choosing administer a chemical test for the purpose specified under sub. (2).... The agency shall comply with a request made in accordance with this paragraph.

The form read to Peterson likewise stated:

> If you take all the requested tests, you may choose to take further tests. You may take the alternative test that this law enforcement agency provides free of charge. You also may have a test conducted by a qualified person of your choice at your expense. You, however, will have to make your own arrangements for that test.

¶14    Thus, pursuant to WIS. STAT. § 343.305(5)(a), law enforcement must "comply with [the accused's] request" and provide a "reasonable opportunity" for the accused to obtain his or her own test within three hours from the time of the stop. Sec. 343.305(5)(a); WIS. STAT. § 885.235(1g); *State v. Vincent*, 171 Wis. 2d 124, 129, 490 N.W.2d 761 (Ct. App. 1992). However, "[t]he agency's responsibility to provide a 'reasonable opportunity' is limited to *not frustrating* the

---

[5] WISCONSIN STAT. § 343.305(5)(a) imposes three obligations on law enforcement: "(1) to provide a primary test at no charge to the suspect; (2) to use reasonable diligence in offering and providing a second alternate test of its choice at no charge to the suspect; and (3) to afford the suspect a reasonable opportunity to obtain a third test, at the suspect's expense." *State v. Stary*, 187 Wis. 2d 266, 270, 522 N.W.2d 32 (Ct. App. 1994); *see also State v. Renard*, 123 Wis. 2d 458, 460-61, 367 N.W.2d 237 (Ct. App. 1985) (concluding that where there is a valid request for a second test, an officer must exercise reasonable diligence in providing it). The second test is, based on the language of the statute, "the alternative test provided by the agency" and is available only if the person submits to the primary test. *See* § 343.305(2), (5)(a). Accordingly, some cases refer to this second, "alternative test" as an "additional test" because it is *in addition* to the primary test, rather than *instead of* that test, *see State v. Schmidt*, 2004 WI App 235, ¶11, 277 Wis. 2d 561, 691 N.W.2d 379, but for ease of reading and for the purpose of this decision, we refer to the third test that the person may request at his or her own expense as the "additional test."

accused's request for his or her own test." *Vincent*, 171 Wis. 2d at 128. Law enforcement has no duty to make arrangements for the person or transport him or her for a test. *Id.* at 128-29.

¶15 Whether Peterson requested an additional test under WIS. STAT. § 343.305(5)(a) is a mixed question of fact and law. *See State v. Schmidt*, 2004 WI App 235, ¶13, 277 Wis. 2d 561, 691 N.W.2d 379. We accept the circuit court's findings of fact and credibility determinations unless they are clearly erroneous, but "construction of the statute and its application to the facts as found by the circuit court present a question of law, which we review de novo." *Id.*

¶16 At the motion hearing, Deputy Benton testified that he read the form to Peterson, and Peterson agreed to take the test. He also stated that "after reading the entire form, [Peterson] asked [Benton] how he would make his own arrangements for the other test." Benton understood Peterson to be asking about "a test conducted by a qualified person of your choice at your expense." *See* WIS. STAT. § 343.305(5)(a). Benton responded by stating that he "didn't know how to make those arrangements for [Peterson]." According to Benton, Peterson did not ask any other questions about the additional test.

¶17 Peterson's version of the conversation was that he told Benton that he wanted an additional test. Peterson testified at the *Machner* hearing that he "specifically asked [Benton] about the alternate test [provided by the agency], which [Benton] indicated … would be a breathalyzer test." Peterson stated that he "was not interested in that," presumably because he had already taken two PBTs. According to Peterson, he then asked Benton "about the additional test, and let [Benton] know that [he] wanted an additional test, the test of your own choosing it's called in the form, and [Benton] told [him], essentially, that [Benton] didn't

know anything about that." Peterson testified that after Benton responded, Peterson "continued to rephrase [his] request to" Benton, asking him "how do I obtain my own test, and how do I make arrangements for it." According to Peterson, he was "essentially … looking for [Benton's] prompt and his permission to pursue that additional test and be given that opportunity."

¶18 The circuit court found that Peterson "asked a reasonable question and the officer gave a reasonable answer[:] I don't know how to facilitate that for you or help you with that." The court recognized, in alignment with the case law, that "under the circumstances, that would be probably a normal response by an officer because it's not the State's obligation at that point to facilitate that type of test." The court also found that there was "no indication in the record that [there was] any more comment or question by the defendant about this third test" and "no indication that any more conversation came up."

¶19 On appeal, Peterson claims that Benton understood—or at least should have understood—that Peterson was seeking an additional test. According to Peterson, "[t]he Informing the Accused form does not suggest that any specific wording is required to invoke the right to a private test; it states only that 'you may choose' and 'you also may have,' and makes no demand for a 'request' at all." (Formatting altered.) He asserts that Benton's testimony showed "he knew that Peterson wanted the private test" and that Benton "admitted that Peterson made multiple requests."

¶20 Contrary to Peterson's assertion, we conclude that he has not demonstrated that he requested, or made clear that he was requesting, the additional test, nor has he established that Benton somehow failed to make him available for an additional test that Peterson attempted to arrange. First, the circuit

court found that Peterson asked how he would get an additional test, that Benton stated that he did not know, that Benton's response was reasonable given the law, and that Peterson never raised the issue again. Peterson has not demonstrated that these findings are clearly erroneous.

¶21 Second, we disagree with Peterson that "[a]sking how [to take an additional test] is the appropriate query." The plain language of WIS. STAT. § 343.305(5)(a) states that the additional test must be "upon his or her request." A request is defined as "the act or an instance of asking for something." *Request*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/request (last visited Mar. 15, 2024). As to Peterson's argument that *the form* "does not require a 'request'" and "therefore accepts a stated choice as a request," we also disagree that Peterson's question to Benton was "equal to 'stating a choice.'" *See Schmidt*, 277 Wis. 2d 561, ¶25. Peterson asked for more information, but he did not ask for, request, or choose an additional test.

¶22 Nevertheless, Peterson claims that "[i]t is impossible that the legislature intended to construct a secret grammatical obstacle that a common individual must clear to invoke one's right to a test of one's own choosing." However, it is not unusual in the legal realm to require an individual to clearly express his or her intent to invoke his or her rights, whether statutory or constitutional. *Cf. State v. Abbott*, 2020 WI App 25, ¶32, 392 Wis. 2d 232, 944 N.W.2d 8 (noting that an invocation of the right to remain silent or the right to counsel must be made "unambiguously" and that "[t]o invoke the right to counsel, a suspect must make an 'unambiguous [and] unequivocal request for counsel'" (second alteration in original; citations omitted)). Peterson's citation to case law outside of our jurisdiction is unavailing.

10

¶23    Further, even if simply asking how to arrange a test was sufficient to indicate to the officer that Peterson had chosen to take an additional test, the law "merely requires the [officer] to make the accused available to obtain his or her own test." *See* **Vincent**, 171 Wis. 2d at 129. "To require the [officer] to take an active part in obtaining a test of the accused's choosing could open the door for other responsibilities to be imposed upon the agency …. We do not believe the statute extends the responsibility of the agency this far." **Id.** at 128. Nothing in the statute requires the officer to take any affirmative steps, reach an agreement with the accused, or actively participate in the process, aside from making the accused available for the test he or she requests and arranges.

¶24    Thus, even if Peterson properly requested to take an additional test, he failed to make arrangements to take the test—which, as the circuit court identified, could have been as simple as requesting an additional test from medical personnel at the hospital. Benton did not mislead Peterson or impede Peterson from taking an additional test; thus, Benton fulfilled his duty under the statute.[6] Peterson is not entitled to the relief he requests.

## II. Right to Counsel

¶25    Peterson next argues that he was denied his Sixth Amendment right to counsel when, as noted above, the circuit court ordered defense counsel not to discuss Peterson's ongoing testimony with him during the overnight recess.

---

[6] Peterson claims that **State v. McCrossen**, 129 Wis. 2d 277, 385 N.W.2d 161 (1986), is the "most relevant binding case law." However, **McCrossen** does not support Peterson's position. First, unlike in **McCrossen**, we have determined that Peterson did not ask for an additional test. *See* **id.** at 281. Further, Peterson was not misled or misinformed about the procedure for an additional test. *See* **id.** Thus, at the very least, this case is entirely distinguishable from **McCrossen** on its facts. Consequently, we will not address that case further.

11

Initially, we recognize that defense counsel did not object to the application of the court's sequestration order to Peterson. Counsel agreed to abide by the court's order, and he did not suggest that he was objecting to any portion of the order. Because defense counsel did not object to the court's order, Peterson has forfeited his right to directly challenge the order on appeal. *See State v. Erickson*, 227 Wis. 2d 758, 765-66, 596 N.W.2d 749 (1999). Peterson does not argue any other basis by which we may review his claim. Thus, Peterson's challenge to the court's sequestration order falls under the ineffective assistance of counsel rubric, *see id.* at 766, which we will address in further detail below, *see infra* ¶¶61-65.

### III. Juror Bias

¶26 Peterson's next claim is that he is entitled to a new trial on the ground that a juror was biased. *See State v. Funk*, 2011 WI 62, ¶32, 335 Wis. 2d 369, 799 N.W.2d 421. "There are three disqualifying forms of juror bias: (1) statutory; (2) subjective; and (3) objective." *State v. Gutierrez*, 2020 WI 52, ¶39, 391 Wis. 2d 799, 943 N.W.2d 870. On appeal, Peterson claims that the juror in question was statutorily and objectively biased. "Prospective jurors are presumed impartial," and Peterson carries the burden to rebut this presumption. *See State v. Lepsch*, 2017 WI 27, ¶22, 374 Wis. 2d 98, 892 N.W.2d 682 (citation omitted).

¶27 During voir dire, the juror informed the circuit court and the parties that he is Deputy Benton's "second or third cousin[]" and that they graduated from high school together but do not see each other often. The juror also stated that he was a neighbor of Peterson, who lived "a couple miles" away, and that he would see Peterson "out in public in various places of business sometimes." When asked how he heard about the accident, the juror admitted that he was close to the

12

accident after it happened, stating that he was a "few blocks away and [saw] an ambulance" and that he felt "very, very sad" "for whoever was involved" in the accident. The juror was not removed for cause by either party, and he sat on Peterson's jury.

¶28 We again observe that it does not appear, based on our review of the record, that defense counsel objected to the juror at any point during voir dire. "[A] defendant [forfeits] an objection to a juror's bias if no motion is made to the [circuit] court to remove the juror for cause."[7] *State v. Brunette*, 220 Wis. 2d 431, 442, 583 N.W.2d 174 (Ct. App. 1998). Nevertheless, "[a] failure to object or to further question a juror may be raised as a claim of ineffective assistance of counsel." *State v. Carter*, 2002 WI App 55, ¶14, 250 Wis. 2d 851, 641 N.W.2d 517. Thus, as with the right to counsel issue, we will address the juror bias issue in further detail below. *See infra* ¶¶46-60.

## IV. Reversal in the Interest of Justice

¶29 Peterson next argues that he is entitled to a new trial in the interest of justice because, during closing arguments, the State misstated the law regarding the affirmative defense to homicide by intoxicated use of a vehicle under WIS. STAT. § 940.09(2)(a). According to Peterson, his affirmative defense—although he suggests on appeal that it was undeveloped at trial—was that his daughter's "large dog vaulted from the passenger floor of the vehicle toward a disturbance outside the driver window, striking the steering wheel and his arms, [and] turning

---

[7] While *State v. Brunette*, 220 Wis. 2d 431, 442, 583 N.W.2d 174 (Ct. App. 1998), refers to "waiver," the more accurate term is "forfeiture." *See State v. Ndina*, 2009 WI 21, ¶29, 315 Wis. 2d 653, 761 N.W.2d 612 (explaining the difference between "forfeiture" and "waiver").

the car." He claims that as a result of the State's error, the real controversy—the presence and the action of the dog in the car relative to the collision—has not been fully tried.

¶30 At the close of evidence, the circuit court instructed the jury on the affirmative defense to homicide by intoxicated use of a vehicle (and while having a PAC) pursuant to WIS. STAT. § 940.09(2)(a). Based upon that statutory affirmative defense, the jury was instructed, in part, that

> Wisconsin law provides that it is a defense to the crime charged in count one if the death would have occurred even if the defendant had been exercising due care and had not been under the influence of an intoxicant.
>
> Wisconsin law further provides that it is a defense to the crime charged in count two if the death would have occurred even if the defendant had been exercising due care and … had not had a [PAC].
>
> The burden is on the defendant to prove by evidence which satisfies you to a reasonable certainty by the greater weight of the credible evidence that this defense is established as to each count.

*See also* WIS JI—CRIMINAL 1189 (2020).

¶31 During its closing argument, the State argued that the accident occurred as a result of Peterson being intoxicated and identified some "excuses"—independent of alcohol—that Peterson gave for why the accident occurred: the victim was speeding, the victim was "probably intoxicated," the sun was in Peterson's eyes, Peterson's windshield was dirty so he could not see clearly, there was a mirage due to a dip in the road, the witnesses on the other motorcycle distracted him, and his daughter's dog caused the car to turn into the victim's motorcycle. The State asked the jury to reject those excuses.

¶32    In response, Peterson's defense counsel argued that the accident was the result of "a lot of causes here and a lot of factors." Counsel then also referenced the sunlight, the dog, and the dirty windshield, as well as the fact that no one tested the victim's blood sugar to see if that played a role in the accident, that Peterson was more sensitive to light "at that point due to his medical issues," and that the victim's motorcycle's headlight was out. According to defense counsel, it was "a combination of all these things coming together that created this accident," and it was "clear to [counsel] that there's no role that alcohol played in that crash."

¶33    In rebuttal, the State explained that the applicability of the affirmative defense is not just based on whether the accident "would … have occurred even if the defendant had not been under the influence of an intoxicant." Instead, the question is whether the "death [would] have occurred even if the defendant had been exercising due care and had not been under the influence of an intoxicant." The State reiterated Peterson's excuses, claiming that they demonstrated that Peterson did not exercise due care because he was taking medication he knew causes vision problems, drank alcohol while on the medication, knew about his dirty windshield and the sun, allowed himself to get distracted by the witnesses on the motorcycle, and had the dog in the car. According to the State, "[T]hat cannot be due care. That's not due care," and "this crash would've happened anyway, there's more to it. You have to find that [Peterson] was also exercising due care and he wasn't. So … this defense doesn't apply."

¶34    As with Peterson's previous two arguments on appeal, defense counsel did not object to the State's affirmative defense discussion during closing arguments; thus, Peterson has also forfeited this claim. *See **State v. Guzman***,

15

2001 WI App 54, ¶25, 241 Wis. 2d 310, 624 N.W.2d 717.  On this issue, however, Peterson appears to concede that he has forfeited this claim, given that he argues he is entitled to reversal under WIS. STAT. § 752.35 because the real controversy was not fully tried.[8]  *See **Vollmer v. Luety***, 156 Wis. 2d 1, 19-20, 456 N.W.2d 797 (1990).   "We exercise our authority to reverse in the interest of justice under … § 752.35 sparingly and only in the most exceptional cases."  ***State v. Schutte***, 2006 WI App 135, ¶62, 295 Wis. 2d 256, 720 N.W.2d 469.  Under the circumstances here, we are not persuaded this is such an exceptional case.

¶35   Postconviction, the circuit court rejected Peterson's argument that the State misstated the WIS. STAT. § 940.09(2)(a) affirmative defense during its closing argument, determining that the State's rebuttal comments were not contrary to the statute.  According to the court, defense counsel's "argument at closing was a far more problematic use of the [affirmative] defense than the State's rebuttal," and "[t]he State's rebuttal was well within the four corners of the instruction given to the jury by the [c]ourt and is not per se objectionable."  As the court explained, "[t]he defense is not:  'even if I am under the influence and not exercising due care this accident would have happened anyway.'"  Instead, "[t]he defense under § 940.[09](2)(a) is:  'even if I was not under the influence and exercising due care, this accident would have happened anyway.'"  We agree with the court that the State did not clearly misstate the law during closing arguments; therefore, Peterson has not shown that the real controversy in this case was not fully tried.  Peterson's arguments to the contrary are unavailing.

---

[8] Peterson also asserts that his defense counsel was constitutionally ineffective based on this issue, which we address further below.  *See infra* ¶¶73-77.

¶36    Peterson first cites ***State v. Raczka***, 2018 WI App 3, 379 Wis. 2d 720, 906 N.W.2d 722 (2017). In that case, Raczka crashed his car into a tree, killing his passenger. ***Id.***, ¶1. The circuit court excluded evidence relating to Raczka's defense, under WIS. STAT. § 940.09(2)(a), that the accident was caused by his seizure because it concluded that "Raczka's failure to take his medication was negligent as a matter of law and a total bar to a defense under" the statute. ***Id.***, ¶¶1, 6. We reversed, concluding that "whether Raczka's failure to take his medication was a failure to exercise due care is a question of fact; it cannot be presumed as a matter of law" and that "[m]any factors could impact Raczka's duty of care and the foreseeability of harm." ***Id.***, ¶15.

¶37    According to Peterson, ***Raczka*** "exemplifies the nuanced approach required to balance due care factors with causality using the 'even-if' statutory analysis of [WIS. STAT. §] 940.09(2)." Peterson claims that "[t]he State argued, 'You have to find that [Peterson] was also exercising due care and he wasn't, so this defense does not apply'" and that "[t]his argument was contrary to ***Raczka***" because "the mere presence of a lack of due care by a defendant in any regard does not make the affirmative defense inapplicable unless the specific lack of due care caused the accident."

¶38    As noted above, we do not conclude that the State misstated the affirmative defense under WIS. STAT. § 940.09(2)(a), nor were the State's closing arguments contrary to ***Raczka***. The law is clear that Peterson's "own negligence is not a defense." *See **Raczka***, 379 Wis. 2d 720, ¶11. Therefore, for the jury to find that the affirmative defense applied, it had to find that Peterson was not acting negligently—in other words, that he was exercising due care. Unlike in ***Raczka***, where the defendant argued only that his seizure caused the accident, ***id.***, ¶3, defense counsel here very clearly argued before the jury that there were "a lot of

causes here and a lot of factors" that caused the accident. Thus, as Peterson argued, to the extent that the State's discussion during closing arguments suggested that "the mere presence of a lack of due care by a defendant *in any regard*" makes the affirmative defense inapplicable, that was simply in response to Peterson's arguments that there may have been many other causes. (Emphasis added.) *See* **State v. Mayo**, 2007 WI 78, ¶43, 301 Wis. 2d 642, 734 N.W.2d 115 ("Even if there are improper statements by a prosecutor, the statements alone will not be cause to overturn a conviction. Rather, the statements must be looked at in context of the entire trial.").

¶39 No matter what Peterson argued caused the accident (i.e., the dog, the sunlight, the dirty windshield)—such "that the death would have occurred even if he … had not been under the influence of an intoxicant"—WIS. STAT. § 940.09(2)(a) still required Peterson to prove that he also exercised due care as to those other causes. *See* **Raczka**, 379 Wis. 2d 720, ¶14 ("As the circuit court correctly recognized, if failing to take the [seizure] medication was negligent and this negligence caused the seizure and the crash, then the statute offers no defense."); **State v. Jacobs**, 2012 WI App 104, ¶33, 344 Wis. 2d 142, 822 N.W.2d 885 ("Jacobs' argument that he was not impaired and did exercise due care misses the mark. He simply did not exercise due care. He blew the stop sign…. But for running the stop sign, the accident would never have occurred."). As the State argued, "[f]or the jury to find that the affirmative defense applied because the crash was caused by something Peterson could not control, it had to find that Peterson was exercising due care in regard to the thing that caused the crash." It was the jury's responsibility to determine whether Peterson met his burden to prove that his negligence did not factor into the other purported causes of the accident. The jury was not misled as to its role.

18

¶40 Next, Peterson claims that this case is similar to *State v. McAdory*, 2021 WI App 89, 400 Wis. 2d 215, 968 N.W.2d 770. There, the defendant was charged with two drug-related driving offenses. *Id.*, ¶1. As relevant to this case, the defendant claimed that the prosecution misled the jury in its opening statement and closing argument about what the State had to show to prove that he was "under the influence" and that the circuit court modified the pattern jury instruction in a manner that created ambiguity regarding the "under the influence" element. *Id.*, ¶¶1-2. This court agreed that the prosecutor's statements misled the jury and explained that "[p]utting together the ambiguous aspects of the instruction with the deeply problematic trial events" related to the sufficiency of the evidence, "we conclude that this created a reasonable likelihood that the jury did not understand the burden that the State had in proving the 'under the influence' element of the [operating a motor vehicle while intoxicated] offense." *Id.*, ¶64.

¶41 *McAdory* is materially distinguishable. Here, Peterson does not allege that the pattern jury instructions given to the jury were ambiguous or incorrect in any manner. Therefore, the jury received instructions that correctly stated the affirmative defense, and, thus, any possible ambiguity created by the State's closing arguments was not compounded by the jury instructions. Further, during the State's closing arguments, it specifically advised the jury to "make sure" to "only look at the jury instruction" rather than follow the State's and defense counsel's visual aids presented to explain the affirmative defense. Peterson also does not claim that the evidence in this case was insufficient for the

19

jury to find that he committed the charged offenses. Thus, this court's conclusion in *McAdory* is simply not applicable here.[9]

¶42 Further, the circuit court specifically instructed the jury that "you must base your verdict on the law I give you in these instructions" and that the jury was to consider "only the evidence received during this trial and the law given to you by these instructions" in reaching its verdicts. We presume that jurors follow the instructions given by the court. *See State v. LaCount*, 2008 WI 59, ¶23, 310 Wis. 2d 85, 750 N.W.2d 780. Therefore, even if the State misstated the affirmative defense during its closing arguments, the jury would not have been misled. Accordingly, the real controversy was fully tried, and Peterson is not entitled to a new trial in the interest of justice.

## V. Ineffective Assistance of Counsel

¶43 To demonstrate constitutionally ineffective assistance of counsel, Peterson must establish both that his defense counsel performed deficiently and that counsel's deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Whether a defendant has been denied constitutionally effective assistance of counsel is a mixed question of law and fact. *State v. Savage*, 2020 WI 93, ¶25, 395 Wis. 2d 1, 951 N.W.2d 838. We will not overturn a circuit court's findings of fact unless those findings are clearly

---

[9] Peterson also cites *State v. Neuser*, 191 Wis. 2d 131, 528 N.W.2d 49 (Ct. App. 1995), and *State v. Weiss*, 2008 WI App 72, 312 Wis. 2d 382, 752 N.W.2d 372, as cases where we "reversed on grounds that a prosecutor misstated the law in closing arguments." Because we have determined that the State in this case did not misstate the law during closing arguments, these cases are inapt, and we will not address them further.

erroneous. *Id.* We review de novo whether counsel performed deficiently and, if so, whether counsel's deficient performance was prejudicial to the defense. *Id.*

¶44 "To demonstrate deficient performance, the defendant must show that his [or her] counsel's representation 'fell below an objective standard of reasonableness' considering all the circumstances." *State v. Shata*, 2015 WI 74, ¶56, 364 Wis. 2d 63, 868 N.W.2d 93 (citations omitted). Our review "of counsel's performance must be highly deferential," and "counsel is strongly presumed to have rendered adequate assistance." *Strickland*, 466 U.S. at 689-90.

¶45 To establish prejudice, "a defendant must show that there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." *Savage*, 395 Wis. 2d 1, ¶32 (citation omitted). However, "a defendant need not prove the outcome would 'more likely than not' be different in order to establish prejudice in ineffective assistance cases." *State v. Sholar*, 2018 WI 53, ¶44, 381 Wis. 2d 560, 912 N.W.2d 89 (citation omitted). "A court need not address both components of this inquiry if the defendant does not make a sufficient showing on one." *State v. Smith*, 2003 WI App 234, ¶15, 268 Wis. 2d 138, 671 N.W.2d 854.

*a. Juror Bias*

¶46 As noted above, Peterson argued on appeal that one of the jurors who sat on his jury was statutorily and objectively biased, and we must consider his arguments on that issue from an ineffective assistance of counsel posture.[10]

---

[10] In the context of an ineffective assistance of counsel claim concerning juror bias, the prejudice prong presents a question of whether defense "counsel's performance resulted in the seating of a biased juror." *See State v. Gutierrez*, 2020 WI 52, ¶45, 391 Wis. 2d 799, 943 N.W.2d 870.

21

*See supra* ¶¶26-28. Peterson also claims that his defense counsel "should have pressed" the juror during voir dire "for further details" related to "how he heard" about the accident and about his "exploration" of the accident scene. (Formatting altered.) For the reasons that follow, we conclude that the record does not support a conclusion that the juror was either statutorily or objectively biased.

¶47 Peterson asserts that the juror was statutorily biased because he and Deputy Benton are second cousins. A juror is statutorily biased if he or she is "related by blood, marriage or adoption to any party or to any attorney appearing in the case, or has any financial interest in the case." WIS. STAT. § 805.08(1). "[A] person meeting one of these descriptions is statutorily biased and may not serve on a jury regardless of his or her ability to be impartial." **State v. Faucher**, 227 Wis. 2d 700, 717, 596 N.W.2d 770 (1999).

¶48 Based on the plain language of the statute, Peterson's claim clearly fails. Benton was not a "party" or an "attorney appearing in the case." A "party" is defined as "[o]ne by or against whom a lawsuit is brought; anyone who both is directly interested in a lawsuit and has a right to control the proceedings, make a defense, or appeal from an adverse judgment." *Party*, BLACK'S LAW DICTIONARY (11th ed. 2019). Thus, in a criminal proceeding, a "party" would include the State and the defendant. While Peterson claims Benton was essentially treated as a party to the case because he "was seated at the prosecution table" and was "sitting as [an] agent with the State," the statute, by its plain language, does not apply where an individual is not a party but is treated like a party.

¶49 Next, Peterson argues that the juror did not correctly and completely answer questions during voir dire and that "[t]his failure," along with the juror's "ties to Benton and Peterson," shows objective bias. "The concept of objective

22

bias relates to the question of 'whether [a] reasonable person in the individual prospective juror's position could be impartial.'" *Lepsch*, 374 Wis. 2d 98, ¶24 (alteration in original; citation omitted). "The focus is on the facts and circumstances surrounding the voir dire and trial, and whether given those facts and circumstances, a reasonable person in the juror's position would be biased." *Funk*, 335 Wis. 2d 369, ¶38. To exclude a juror because of objective bias, there must be either: "(1) some direct or personal connection between the challenged juror and some important aspect of the particular case, or (2) a firmly held negative predisposition by the juror regarding the justice system that precludes the juror from fairly and impartially deciding the case." *State v. Jimmie R.R.*, 2000 WI App 5, ¶19, 232 Wis. 2d 138, 606 N.W.2d 196.

¶50 We review whether a juror is objectively biased as a mixed question of fact and law. *Funk*, 335 Wis. 2d 369, ¶30. We uphold the circuit court's findings of fact unless they are clearly erroneous, but we review whether those facts fulfill the legal standard for objective bias de novo. *Id.* "Although we do not defer to a circuit court's decision on a question of law, where the factual and legal determinations are intertwined (as they are in determining objective bias), we give weight to the circuit court's legal conclusion." *Id.* "We have said that we will reverse a circuit court's determination in regard to objective bias 'only if as a matter of law a reasonable judge could not have reached such a conclusion.'" *Id.* (citation omitted).

¶51 Initially, we agree with the circuit court that the juror's testimony at the *Machner* hearing did not reveal any additional material information suggesting that he incorrectly or incompletely responded to a question during voir dire. *See Funk*, 335 Wis. 2d 369, ¶¶32, 39 (discussing the standards by which we are to review an objective bias claim "[i]n cases involving a juror who was not

forthcoming during voir dire and subsequently sat on the jury").[11] As noted above, *see supra* ¶27, the juror disclosed his relationship with Benton, his previous interactions with Peterson, and his presence at the scene of the accident during voir dire. At the ***Machner*** hearing, the juror provided further details. He testified that he and Benton are second cousins and that the high school that they attended had a class of about thirty-five people, but he stated that they did not "hang around in the same circle" and socialized only "[o]nce in a great while." As for Peterson, the juror explained that Peterson was a customer at the convenience store where the juror worked and that Peterson was "[a]lways" "cordial," the juror never had "any issues" with Peterson, and he had never seen Peterson intoxicated. The juror also stated that he knew of a disagreement someone else had with Peterson.

¶52 The juror noted that on the night of the accident, he was "literally there in the aftermath." According to the juror, he observed "the car crashed, and then the motorcycle on its side, barricades everywhere, police activity everywhere." He testified that he got as close "as the barricades would let [him]," which was "a couple hundred feet," but he did not talk to anyone at the scene. Instead, the juror stated that he spoke with an individual at a bar "[l]ess than half a block" down the road who knew that Peterson and another person were involved.

¶53 Peterson claims that the juror provided "false" information due to the differences between his answers during voir dire and his testimony at the ***Machner*** hearing. According to Peterson, during voir dire, the juror should have

---

[11] To prove objective bias, a defendant must prove both: (1) "that the juror incorrectly or incompletely responded to a material question on *voir dire*," and if so, (2) "that it is more probable than not that under the facts and circumstances surrounding the particular case, the juror was biased against the moving party." ***State v. Funk***, 2011 WI 62, ¶32, 335 Wis. 2d 369, 799 N.W.2d 421 (citation omitted).

stated that he heard about the accident from individuals at the bar, he should have admitted that he was less than half a block away rather than a few blocks away, and he should have stated that he saw the wreckage rather than that he saw an ambulance from a distance.

¶54     The circuit court rejected Peterson's claim that the juror provided false information.  Specifically, the court found that "[t]he testimony at the postconviction motion hearing regarding [the juror's] relationship [with Benton] did not lend much more detail th[a]n what was known on the day the jury was selected."  Further, it noted that it could not "conclude a lack of candor existed when asked questions about [the juror's] prior knowledge of the accident scene."  Finally, it found that the juror's familiarity with Peterson had no impact on his opinion of Peterson.  Based on this record, we cannot conclude that the court's findings were clearly erroneous.

¶55     We also conclude that the record fails to demonstrate that the juror was objectively biased.  In support of his position that the juror was objectively biased, Peterson cites first to **United States v. Brazelton**, 557 F.3d 750 (7th Cir. 2009), for the proposition that "the court recognized implied bias where a juror shares 'any degree of kinship with a principal in a case,' and that it would be prudent to disqualify a juror who was second cousin of the complaining witness." *See **id.*** at 754.  In that case, "one of the jurors seated was [a second cousin of] the victim in the [uncharged] shooting that led to Brazelton's arrest and the search of his home." **Id.** at 752, 754.

¶56     Peterson's citation to **Brazelton** is inapt.  First, the case involved a juror's relationship to a *victim* of a crime connected to the case, **id.** at 754, not to a law enforcement officer investigating the case.  Second, the federal court did not

25

determine "whether the relationship [of a second cousin] is close enough to assume bias"; instead, the court stated it "need not answer that question" because "Brazelton's on-the-record decision to pass up not one, but two opportunities to ask that Juror Number Four be struck for cause was a waiver" and "would be equivalent to allowing the defendant to 'plant an error and grow a risk-free trial.'" *Id.* at 754-55 (citation omitted). Finally, even if the court had determined that a second cousin is close enough to assume bias, we would not be bound by the court's decision. *See Lomax v. Fiedler*, 204 Wis. 2d 196, 217, 554 N.W.2d 841 (Ct. App. 1996) (explaining that decisions of federal district and appellate courts are not binding on state courts).

¶57 Equally unavailing is Peterson's citation to *State v. Gesch*, 167 Wis. 2d 660, 663, 665, 482 N.W.2d 99 (1992), where a prospective juror was the brother of a police officer who was the state's witness. Our supreme court concluded that a reasonable person would have a difficult time "remain[ing] unaffected by the testimony of a relative by blood or marriage to the third degree." *Id.* at 663, 667-68. Unlike in *Gesch*, the juror in this case was not a "relative by blood or marriage to the third degree." *See* WIS. STAT. § 990.001(16). Thus, *Gesch* does not mandate a finding of objective bias. Second, the brothers in *Gesch* had a close relationship, while Benton and the juror in the instant case did not have any significant relationship. *See Gesch*, 167 Wis. 2d at 664.

¶58 Considering both the juror's statements during voir dire as well as his testimony at the *Machner* hearing, we do not agree with Peterson that the juror's relationship to Benton, his familiarity with Peterson, or his observations of the accident site qualify as "some direct or personal connection" with "some important aspect of" this case such that a reasonable person in the juror's position could not set aside his or her opinion or knowledge and be impartial. The juror

was merely Benton's very extended relative, and the two men did not have a relationship, let alone a significant one. The same applies to the juror's overall familiarity with Peterson. The juror testified that he had interacted with Peterson where he worked, but there was no suggestion of any negative experiences directly with Peterson such that a reasonable person living in a small, rural community could not be impartial under the same circumstances.

¶59    Finally, while the juror may have witnessed the aftermath of the accident, we are not convinced that this connection to the case warrants a determination of objective bias. The juror testified that he saw the motorcycle on its side, but there was no indication that he witnessed or heard anything more inflammatory, such as seeing the victim after the accident or hearing people negatively discuss Peterson either at the scene or later at the bar. Merely expressing sadness for those involved does not objectively demonstrate bias, absent some direct or personal connection.

¶60    In summary, we agree with the circuit court's conclusion that the juror in this case was not objectively biased. Peterson has not shown that further questioning of the juror—as to how the juror heard about the crash and about his "exploration" of the crash scene—would have yielded a different outcome because the juror's answers at the *Machner* hearing did not reveal any additional evidence of bias such that a "reasonable person" in the juror's position could not be impartial. *See Lepsch*, 374 Wis. 2d 98, ¶24. Therefore, Peterson has failed to demonstrate that defense counsel performed deficiently, and, accordingly, defense counsel was not ineffective by failing to remove the juror from the panel. *See State v. Wheat*, 2002 WI App 153, ¶23, 256 Wis. 2d 270, 647 N.W.2d 441 (counsel is not ineffective for failing to make meritless arguments).

*b. Right to Counsel*

¶61 Peterson next claims that defense counsel was ineffective by not objecting when the circuit court ordered counsel not to discuss Peterson's ongoing testimony with him during the overnight recess. According to Peterson, "[c]ounsel cheerfully volunteered not to talk to Peterson about his testimony between day three and day four of trial." (Formatting altered.) Peterson claims that this order resulted in the constructive denial of his right to counsel.

¶62 Both Peterson and the State agree that *Geders* and *Perry* provide precedential value, but, as the circuit court recognized, neither case directly addresses the specific issue here because "the restriction to counsel was narrowed down to a prohibition on discussing the defendant's testimony until his time in the witness stand under oath had lapsed. No other denial of communication or contact was in place and communication did occur between the defendant Peterson and his counsel." *See Geders*, 425 U.S. at 91 ("[A]n order preventing petitioner from consulting his counsel 'about anything' during a 17-hour overnight recess between his direct- and cross-examination impinged upon his right to the assistance of counsel guaranteed by the Sixth Amendment."); *Perry*, 488 U.S. at 284-85 ("[T]he Federal Constitution does not compel every trial judge to allow the defendant to consult with his lawyer while his testimony is in progress if the judge decides that there is a good reason to interrupt the trial for a few minutes.").

¶63 Nevertheless, the State claims that the reasoning of *Geders* and *Perry* supports the circuit court's conclusion that its sequestration order did not violate Peterson's right to counsel because the order was limited to discussing Peterson's testimony, not limiting *any* discussion. Peterson disagrees and cites several cases outside our jurisdiction in support of his argument that the court's

order resulted in a constructive denial of meaningful counsel. *See United States v. Santos*, 201 F.3d 953 (7th Cir. 2000); *Martin v. United States*, 991 A.2d 791 (D.C. Cir. 2010); *United States v. Triumph Capital Grp., Inc.*, 487 F.3d 124 (2d Cir. 2007); *United States v. Cobb*, 905 F.2d 784 (4th Cir. 1990); *United States v. Sandoval-Mendoza*, 472 F.3d 645 (9th Cir. 2006); *Mudd v. United States*, 798 F.2d 1509 (D.C. Cir. 1986).

¶64    As noted above, *see supra* ¶25, defense counsel did not object to the circuit court's sequestration order; therefore, we must review Peterson's challenge under the ineffective assistance of counsel rubric. To prove that counsel was ineffective for not objecting to the court's order, Peterson must show that it was settled law that the court's order was improper. *See State v. Breitzman*, 2017 WI 100, ¶49, 378 Wis. 2d 431, 904 N.W.2d 93. "[F]ailure to raise arguments that require the resolution of unsettled legal questions generally does not render a lawyer's services 'outside the wide range of professionally competent assistance' sufficient to satisfy the Sixth Amendment." *Id.* (alteration in original; citation omitted).

¶65    The one thing that the parties, as well as the circuit court, agree on is that this issue is one of first impression in this jurisdiction because no Wisconsin case has addressed whether a limited sequestration order between the defendant and defense counsel violates the Sixth Amendment. All of the cases cited by Peterson in support of his position are federal appellate court cases, which are not

binding on this court.[12]   *See Lomax*, 204 Wis. 2d at 217.   Therefore, in one scenario, Peterson's defense counsel did not perform deficiently because *Geders* and *Perry* do not specifically prohibit the court's sequestration order in this case, and, therefore, counsel did not perform deficiently by failing to object based on a meritless argument.   *See Wheat*, 256 Wis. 2d 270, ¶23.   In another scenario, the issue is unsettled; therefore, defense counsel did not perform deficiently by not objecting.   *See Breitzman*, 378 Wis. 2d 431, ¶48.

### c. Jail Call

¶66    Peterson next argues that defense counsel provided constitutionally ineffective assistance because he failed to prepare Peterson with the jail call recording used by the State as impeachment evidence at trial.   As noted, during cross-examination, the State presented Peterson with a recorded jail call after he denied stating that he had three or four drinks in the eight hours before the crash.

¶67    On appeal, Peterson dubs this jail call "devastating impeachment evidence" and claims that it was "possible only because he was unaware of the jail call evidence, which made him look like a liar in front of the jury."   He testified at the *Machner* hearing that the first time he heard the jail call recording was at trial, that he had not been aware it existed, that defense counsel never provided him with that jail call recording, and that counsel never discussed that phone call with him.   Peterson argues that if defense counsel had discussed the jail call with him,

---

[12] We note that the circuit court's amended order denying Peterson's postconviction motion, *see supra* note 4, specifically addresses Peterson's reference at the hearing to *United States v. Santos*, 201 F.3d 953 (7th Cir. 2000), admitting that the court's previous statement that no cases on the subject of sequestration orders between the defendant and counsel "existed in Wisconsin or the 7th Circuit was in error."   The court recognized that *Santos* supports Peterson's argument but correctly stated that "Wisconsin law remains silent on this issue."

then counsel "could have prepared Peterson for cross-examination and given him an opportunity to explain the circumstances surrounding the jail call."

¶68 Defense counsel testified at the *Machner* hearing that all Peterson's jail calls had been provided to the defense prior to trial by the State and that he had reviewed the jail calls. Counsel explained that he did not "recall a specific conversation [he] had" with Peterson regarding the jail calls, but he stated that he was "fairly confident that [he] reviewed with [Peterson] the fact that those calls exist[ed]." According to defense counsel, it was his typical procedure to "review prior [inconsistent] statements made by" a defendant, so he had "to assume that [he] would have" had those discussions with Peterson, especially given the amount of time counsel spent with Peterson "discussing the case, and discussing his recollection of the facts, and what he would testify to." Defense counsel admitted, however, that "it is possible that [he] did not specifically discuss [statements concerning how much Peterson had to drink] with him in this case, and … that would be a mistake."

¶69 Based on defense counsel's testimony, the circuit court rejected Peterson's claim that counsel was ineffective. According to the court, the testimony "clearly shows Peterson met with [his defense counsel] quite often before trial, [and] almost certainly went over his potential testimony and the likely areas of cross[-examination] and impeachment." Based on the record, the court found "that there was a good chance those recordings were part of the attorney/client preparation," and if the recordings were not, Peterson cannot seriously claim he was not aware of the recordings. As the court explained, "all phone calls from the Bayfield County jail are recorded and all inmates are placed on notice before each call that they will be recorded," so "the existence of these recordings was not a surprise to the defendant" and he "knew about those calls

long before his attorney." Finally, the court concluded that for Peterson "[t]o claim ignorance of the calls at this point seems oddly disingenuous."

¶70 We conclude that regardless of whether defense counsel did or did not discuss the jail call evidence with Peterson prior to trial, Peterson has failed to establish that he was prejudiced by counsel's alleged deficient performance. Peterson told Deputy Benton at the scene of the accident that he had only one drink, and Peterson testified at trial that he had only one drink. He later admitted that he had three or four drinks before the accident; thus, the record suggests that Peterson lied to law enforcement and to the jury.

¶71 Given the circumstances, we agree with the circuit court that the State would have presented the jail call regardless of whether Peterson and defense counsel had or had not discussed the call in advance of Peterson's testimony. We also see no error in the court's findings that there is "no indication" in the record that Peterson would have elected not to testify, that Peterson had "an alternate set of facts explaining the admission against his own interest," or that "a better explanation could have been presented" for his statement about having three or four drinks. Prejudice requires that Peterson "show that there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." *See Savage*, 395 Wis. 2d 1, ¶32 (citation omitted). Peterson has failed to argue that he would not have testified or how he would have explained his later admission to having three or four drinks to the jury had he been alerted to the jail call during trial preparation by defense counsel. Peterson has not shown prejudice and is not entitled to relief on this issue.

#### d. "Lack of Remorse" Evidence

¶72    Peterson next argues that his defense counsel was constitutionally ineffective by not objecting to evidence pertaining to his lack of remorse after the accident.  According to Peterson, the circuit court granted his request for an order prohibiting evidence as to a witness's opinion regarding his alleged lack of remorse at the scene, but he claims the order was not enforced.  On appeal, Peterson does not identify for this court exactly what trial testimony was objectionable or develop any argument based on the two-part *Strickland* test; instead, Peterson merely directs our attention to his postconviction motion.  Accordingly, Peterson has not developed this argument on appeal, and we do not consider undeveloped arguments.  *See* *State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992); *see also* *Ellsworth v. Schelbrock*, 229 Wis. 2d 542, 566, 600 N.W.2d 247 (Ct. App. 1999), *aff'd*, 2000 WI 63, 235 Wis. 2d 678, 611 N.W.2d 764 ("[W]e consider 'for-reasons-stated-elsewhere' arguments to be inadequate and decline to consider them.").

#### e. Affirmative Defense

¶73    Peterson's final ineffective assistance claim is that defense counsel was constitutionally ineffective by failing to object to the State's misstatement of the affirmative defense during closing arguments and by not further developing his defense that his daughter's dog caused him to crash his car into the motorcycle and kill the victim.  On the first issue, as determined above, the State did not misstate the law during its closing argument.  *See supra* ¶¶29-42.  Therefore, defense counsel was not deficient by failing to object based on this meritless argument. *See* *Wheat*, 256 Wis. 2d 270, ¶23.

¶74    On the second issue, Peterson argues that defense counsel "devoted negligible time to the dog's actions." According to Peterson, "[t]he dog's photo was not shown along with [a] description of the collision. At no point did [c]ounsel identify the dog's charge inside the vehicle as the basis for Peterson's affirmative defense to the jury, nor is the dog mentioned in opening or closing arguments." (Formatting altered.) We conclude that Peterson has failed to establish that defense counsel performed deficiently on this issue.

¶75    First, we agree with the circuit court's analysis in its postconviction motion decision. According to the court, "a careful reading of the evidence regarding this alleged event clearly reveals that the entire dog related occurrence would have lasted no more than a few seconds. It is difficult to conclude the evidence presented about the alleged occurrence does not represent the totality of all that could be said." Our review of the record also reveals that Peterson and his daughter both testified regarding the incident with the dog. The court further identified that defense counsel "gave no specifics as to why he did not spend more time on the dog defense" at the *Machner* hearing, but the court speculated that "[i]t may have been because there was so little to say or that the testimony elicited on the issue seemed spurious in light of the gravity of the situation." Finally, we question the strength of this argument, given that neither Peterson nor his daughter told officers on the scene that the dog was responsible for the crash.

¶76    As to Peterson's specific arguments on appeal, he first claims that the dog's photo was not shown by defense counsel at the proper time. Our review indicates that the dog's photo *was* shown to the jury during Peterson's direct testimony, and Peterson has not argued how counsel performed deficiently by failing to show the dog's photo "along with [a] description of the collision" or how doing so may have led to a different outcome at trial. Next, he claims that counsel

did not identify the dog as the basis for Peterson's affirmative defense, but it was clear, based on Peterson's testimony, that he was claiming that the dog coming into his space caused his vehicle to turn left in front of the victim. Further, we disagree with Peterson that defense counsel did not mention the dog during opening and closing arguments. The dog was absolutely mentioned by counsel.

¶77 Overall, Peterson fails to point to any additional evidence regarding the dog that defense counsel should have or could have presented at trial. Therefore, Peterson has not demonstrated that defense counsel performed deficiently. Peterson is not entitled to a new trial.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.