COURT OF APPEALS
DECISION
DATED AND FILED

December 26, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.     2022AP1763-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2019CF213

**IN COURT OF APPEALS
DISTRICT III**

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

TRAVIS J. RAGEN,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Oconto County: MICHAEL T. JUDGE, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Travis Ragen appeals a judgment, entered upon his no-contest plea, convicting him of homicide by intoxicated use of a vehicle, contrary

to WIS. STAT. § 940.09(1)(a) (2021-22).[1]  Ragen argues that the circuit court erred by applying the good faith exception to the exclusionary rule to deny his motion to suppress the results of a nonconsensual, warrantless blood draw.  We reject Ragen's arguments and affirm the judgment.

## BACKGROUND

¶2      At approximately 11:00 p.m. on November 15, 2019, law enforcement was dispatched to the scene of what was reported as a one-vehicle rollover crash in Oconto County.  The first responding officer, Oconto County Sheriff's Deputy Alexander Scray, observed that a pickup truck was on its roof in a ditch along the side of the highway and that its engine compartment was on fire.  The driver of the truck, later identified as Ragen, was in the vehicle, unconscious with multiple lacerations to his face.  While Scray dragged Ragen out of the vehicle and over to the other side of the highway, he noted that Ragen smelled of intoxicants.  After other officers and emergency personnel arrived, Scray followed the ambulance transporting Ragen to the hospital.  En route to the hospital, Scray learned that there was a second vehicle found under the truck, and the driver of that vehicle had died.

¶3      Approximately thirty to sixty minutes after arriving at the hospital, Deputy Scray was allowed to enter Ragen's hospital room.  Although Ragen was still unconscious, Scray read Ragen the "Informing the Accused" form and asked for his consent to a blood test.  When Ragen did not respond, Scray directed medical staff to draw Ragen's blood.  The resulting chemical test revealed a blood alcohol concentration of 0.21—more than twice the legal limit.

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶4    The State charged Ragen with second-degree reckless homicide, homicide by intoxicated use of a vehicle, and homicide by use of a vehicle with a prohibited alcohol concentration.  Ragen moved to suppress the blood test results, and the circuit court denied the motion after a hearing.  Although Ragen moved for reconsideration, he opted to enter into a plea agreement before the court ruled on his motion.

¶5    In exchange for Ragen's no-contest plea to homicide by intoxicated use of a vehicle, the State agreed to recommend that the circuit court dismiss and read in the remaining counts.  The State also agreed to recommend a fifteen and one-half year sentence, consisting of seven and one-half years of initial confinement followed by eight years of extended supervision, to run consecutive to Ragen's sentence in another matter.  Out of a maximum possible twenty-five-year sentence, the court imposed a fifteen-year sentence, consisting of nine years of initial confinement followed by six years of extended supervision.  This appeal follows.

## DISCUSSION

¶6    On appeal, Ragen argues that the circuit court erred by denying his motion to suppress the results of his warrantless blood draw.  The denial of a suppression motion is analyzed under a two-part standard of review:  we uphold the circuit court's findings of fact unless they are clearly erroneous, but we independently review whether those facts warrant suppression.  *State v. Conner*, 2012 WI App 105, ¶15, 344 Wis. 2d 233, 821 N.W.2d 267.

¶7    The Fourth Amendment to the United States Constitution guarantees that the "right of the people to be secure in their person ... against unreasonable searches and seizures, shall not be violated."  U.S. CONST. amend. IV.  When law enforcement collects a blood sample for chemical testing, it has conducted a

"search" governed by the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 767 (1966). A warrantless search is unreasonable, and therefore unconstitutional, unless it falls within one of the "specifically established and well-delineated exceptions to the Fourth Amendment's warrant requirement." *State v. Williams*, 2002 WI 94, ¶18, 255 Wis. 2d 1, 646 N.W.2d 834. "When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987).

¶8    The exclusionary rule, however, "is a judicially created remedy, not a right, and its application is restricted to cases where its remedial objectives will best be served." *State v. Dearborn*, 2010 WI 84, ¶35, 327 Wis. 2d 252, 786 N.W.2d 97. "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances, recurring or systemic negligence." *Id.*, ¶36. Therefore, courts have crafted some exceptions to the rule where exclusion of the evidence would not serve the rule's purpose.

¶9    As relevant here, the good faith exception to the exclusionary rule applies when "the officers conducting an illegal search 'acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment.'" *Id.*, ¶33 (quoting *United States v. Leon*, 468 U.S. 897, 918 (1984)). This exception may apply when law enforcement acted in objective good faith reliance "on settled law (whether statute or binding judicial precedent) that was subsequently overruled." *State v. Prado*, 2020 WI App 42, ¶67, 393 Wis. 2d 526, 947 N.W.2d 182, *aff'd*, 2021 WI 64, 397 Wis. 2d 719, 960 N.W.2d 869. .

¶10    At the suppression motion hearing, Deputy Scray testified that at the time he directed hospital staff to draw Ragen's blood, he thought that Ragen's blood

could be drawn under the implied consent law, which he understood as the "Wisconsin statute that suggests that people who apply for a license in Wisconsin consent to a blood draw."

¶11     At the time of Ragen's blood draw, Wisconsin's implied consent law provided:

> Any person who ... drives or operates a motor vehicle upon the public highways of this state ... is deemed to have given consent to one or more tests of his or her breath, blood or urine, for the purpose of determining the presence or quantity in his or her blood or breath, of alcohol, controlled substances, controlled substance analogs or other drugs, or any combination [thereof], when requested to do so by a law enforcement officer under sub. (3)(a) or (am) or when required to do so under sub. (3)(ar) or (b).

WIS. STAT. § 343.305(2) (2019-20). A subsection of the implied consent law, known as the incapacitated driver provision, also provided that a person who is unconscious or otherwise incapable of withdrawing consent is presumed not to have withdrawn consent, thus allowing a sample to be drawn from his or her person. *See* § 343.305(3)(b) (2019-20). As a result, this subsection permitted law enforcement to direct a warrantless blood draw if the officer had probable cause to believe that an incapacitated person had violated certain statutes relating to the operation of a vehicle while intoxicated or with a prohibited alcohol concentration. Seven months *after* Ragen's blood draw, the incapacitated driver provision was deemed unconstitutional by this court in *Prado*, 393 Wis. 2d 526, ¶3, and that decision was affirmed by our supreme court in *Prado*, 397 Wis. 2d 719, ¶3.

¶12     At Ragen's suppression hearing, the circuit court acknowledged that our supreme court had recently declared the incapacitated driver provision to be unconstitutional. The court, however, emphasized Deputy Scray's belief that "if he

5

was dealing with an unconscious person who had possibly been involved in an operating while intoxicated driving event that he could authorize a blood draw without a warrant." Based on this testimony, the court found that Scray relied on the implied consent statute as it then existed when he directed Ragen's blood draw. Because no court had declared the incapacitated driver provision unconstitutional until after it was used to draw Ragen's blood, the court properly applied the good faith exception to the exclusionary rule when denying Ragen's suppression motion. *See* ***State v. Blackman***, 2017 WI 77, ¶70, 377 Wis. 2d 339, 898 N.W.2d 774.

¶13 Ragen nevertheless challenges the circuit court's application of the good faith exception on several grounds. We reject each argument in turn. First, Ragen asserts, generally, that the Fourth Amendment's protections must be "liberally construed" in his favor. Despite the liberal protections of one's Fourth Amendment rights, and despite judiciously limiting exceptions to the exclusionary rule, the Wisconsin Supreme Court determined in ***Prado*** that the good faith exception applied where, as here, blood samples were drawn pursuant to the incapacitated driver provision before that provision was declared unconstitutional. *See* ***Prado***, 397 Wis. 2d 719, ¶4.

¶14 Citing ***State v. Eason***, 2001 WI 98, 245 Wis. 2d 206, 629 N.W.2d 625, Ragen asserts that Wisconsin has adopted a more restrictive approach to the application of the good faith exception, and the circuit court should have taken that approach here. In ***Eason***, the court determined that an affidavit submitted in support of a search warrant did not justify authorizing a no-knock entry. ***Id.***, ¶1. The ***Eason*** court nevertheless applied the good faith exception because the State had met its burden of showing that "the process used in obtaining the search warrant included a significant investigation and a review by either a police officer trained and knowledgeable in the requirements of probable cause and reasonable suspicion, or

6

a knowledgeable government attorney." *Id.*, ¶3. While Ragen acknowledges that this more restrictive approach of "significant investigation" was applied in circumstances involving a search warrant, he claims it should apply with equal force when the search is authorized by a statute.

¶15 Ragen, however, fails to address how additional investigation by Deputy Scray would have altered his actions. Under the law as it existed at that time, contact with a supervisor or a district attorney would have had the same result, as the incapacitated driver provision permitted the warrantless blood draw under the circumstances of this case.

¶16 Second, Ragen contends that the good faith exception cannot apply unless Deputy Scray relied on "clear and settled precedent" governing the incapacitated driver provision, and such precedent did not exist when his blood was drawn. In support of this point, Ragen cites several cases, suggesting that the law regarding seizure of evidence from incapacitated drivers was in flux at the time his blood was drawn. It is undisputed, however, that the incapacitated driver provision was not declared unconstitutional until after Ragen's blood draw. As our supreme court recognized in *Prado*,

> Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his [or her] responsibility to enforce the statute as written.

*Prado*, 397 Wis. 2d 719, ¶63 (quoting *Krull*, 480 U.S. at 349-50. Because the subject provision had not yet been declared unconstitutional at the time of Ragen's blood draw, Scray acted in good faith when relying on the provision.

¶17     Ragen nevertheless argues that there was inconsistent precedent, given the United States Supreme Court's decision in *Missouri v. McNeely*, 569 U.S. 141, 156 (2013), which concluded that the natural dissipation of alcohol in a drunk driver's blood stream did not constitute a per se exigency justifying a warrantless blood draw.     The *McNeely* Court acknowledged that technology-based developments may streamline the warrant process, and it reasoned that where "the warrant process will not significantly increase the delay before the blood test[,] … there would be no plausible justification for an exception to the warrant requirement." *Id.* at 153-54.

¶18     Citing this passage, Ragen argues that because Deputy Scray made no effort to obtain a warrant, he was not acting "reasonably" on any "settled precedent." To the extent Ragen suggests that the *McNeely* Court held there is *never* a plausible justification for an exception to the warrant requirement, he is mistaken.   The *McNeely* Court ultimately determined that although the dissipation of alcohol in the blood does not categorically create an exigency, it may support a finding of exigency in a specific case.  *Id.* at 156.   Moreover, the facts of *McNeely* are materially distinguishable, as that case did not involve an incapacitated driver or a statute specifically allowing for a warrantless blood draw from an incapacitated driver.

¶19     Third, Ragen argues that our supreme court's decision in *Blackman* provides an "equally sound basis" to reject the good faith exception in the present case. *Blackman* is again materially distinguishable on its facts.  There, our supreme court declined to apply the good faith exception where law enforcement "gave an accused inaccurate information upon which the accused's coerced consent was based." *Blackman*, 377 Wis. 2d 339, ¶71.  The *Blackman* court reasoned that the exclusionary rule's deterrent effect "will be served if the evidence in the instant case

is suppressed." *Id.*, ¶74. Here, Deputy Scray reasonably relied on the implied consent statute, as it existed, when he directed Ragen's blood draw. Excluding the blood results under these circumstances would not serve the exclusionary rule's purpose.

¶20 Finally, Ragen faults Deputy Scray for failing to determine whether it was feasible to obtain a warrant before directing a blood draw pursuant to the implied consent statute. In *Prado*, however, our supreme court held that the good faith exception applied despite the arresting officer making no attempt to secure a warrant and testifying that "it did not occur to him to do so because the incapacitated driver provision applied." *Prado*, 397 Wis. 2d 719, ¶10. Thus, we are not persuaded that Scray's failure to first seek a warrant has any bearing on whether the good faith exception applies to the evidence gathered under the statute as it then existed.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.